On October 30, 2002, B.D.S. ("the mother") filed a petition for custody of child A, child B, child C, and child D ("the children"). At the time the mother filed her petition for custody, the children had been adjudicated dependent by the trial court and had been placed in the custody of the Calhoun County Department of Human Resources ("DHR").[1] On November 14, 2002, DHR filed separate petitions to terminate the parental rights of the mother and B.D.S. ("the father"). On January 17, 2003, the trial court held a hearing and received ore tenus evidence. On January 30, 2003, the trial court entered an order terminating the parental rights of the mother and the father and denying the mother's petition for custody. The mother and the father filed postjudgment motions that were denied by the trial court. The mother and the father appealed.
Before DHR petitioned to terminate the mother's and the father's parental rights on November 14, 2002, it had filed a prior petition to terminate the mother's and the father's parental rights; that petition was denied by the trial court following an ore tenus hearing on May 24 and 25, 2002. A transcript of that hearing was admitted into evidence during the January 17, 2003, hearing on DHR's second petition to terminate the parental rights of the mother and the father. *Page 1044 
The testimony from the May 24 and 25, 2002, hearing and the evidence introduced at that hearing reveal the following facts. The mother was born on June 7, 1970, and the father was born on October 8, 1971. The mother and father were married for 12 years and had four children: child A, born on January 28, 1990; child B, born on October 1, 1993; child C, born on October 18, 1995; and child D, born on August 5, 1997. At the time of the May 2002 hearing, child A was 12 years old, child B was 8 years old, child C was 6 years old, and child D was 4 years old.
The mother and father had a volatile relationship; the parties frequently separated and reconciled. When the mother and father were separated, the mother lived with her boyfriend, J.G. At various times during her relationship with J.G., the mother moved to Ashland, Alabama; Mississippi; and Miami, Florida, to live with J.G. When the mother moved to live with J.G., she would separate the children. During some of her moves, the mother would take child C and child D, and leave child A and child B at a relative's house in Alabama; at other times, she would take child B, child C, and child D, while leaving child A with relatives. B.O., the maternal grandmother; C.W., the maternal aunt; and E.S., the paternal great-grandmother, looked after child A and child B when the mother moved. Testimony revealed that, since 1997, child A had primarily lived with relatives.
At the time of the May 24 and 25, 2002, hearing, the mother and father were separated but had not yet filed for a divorce. The mother testified that she had ended her relationship with J.G. in July 2001, when child D was taken into DHR's custody. According to the mother, she left the father to live with J.G. approximately five times. The mother stated that J.G. was physically abusive to her during their relationship and that he had hit her twice in front of the children. The mother also testified that the she and the father had "pushing arguments" and that he was verbally abusive to her.
At the time of the May 2002 hearing, the mother lived in Carrollton, Georgia, in a mobile home with two bedrooms and one bath. At the time of the hearing, the mother had been employed for two months and earned approximately $8 per hour. The mother testified that her longest span of employment was a period of eight months in 1996 or 1997.
The father denied ever hitting the mother. The father testified that he knew that the mother was dating J.G. and that J.G. was physically abusive to the mother, but he stated that he never worried about the children when they were with the mother and J.G. The father testified that he loves the children and that he wants the children to live with him. If the mother is granted custody of the children, the father testified that he would support the children. The father had paid child support for the benefit of the children.[2]
The father admitted to having had problems with alcohol abuse in the past. Pam Whitley, a service supervisor for DHR, testified that a home visit to the father and mother's home in or around August 1999 revealed empty beer cans strewn in the yard and probable alcohol abuse on the part of the father. The father testified that he had completed an alcohol treatment program approximately five years before the May 2002 hearing in conjunction with a conviction for driving under the influence, but he admitted that he began abusing alcohol again shortly after completing *Page 1045 
the program. According to the father, he had stopped drinking alcohol and was in counseling for his problem, at the time of the hearing.
The father testified that he had been employed with the same company for 10 years and that he earned $79.50 per day. The father stated that he worked from 5:30 a.m. to 5 p.m., six days per week. At the time of the hearing, the father shared a two-bedroom mobile home with B.O., his mother-in-law. The father testified that he had lived with B.O. for six months — since B.O. had separated from her husband C.O. — but the father denied having a sexual relationship with her.
DHR first became involved with the mother and father in February 1990, after receiving a report of neglect of child A; a subsequent investigation revealed that neglect was not indicated. In March 1990, DHR investigated allegations of inadequate nutrition and clothing for child A, and it found that the allegations were indicated. The case was opened for on-going services, and it was closed in 1992 after DHR received no further reports about the mother and the father. In January 1997, DHR received a report of allegations of domestic violence between the mother and the father occurring in front of child A, child B, and child C. The report also stated that the father abused alcohol and drove child A, child B, and child C around in his car while intoxicated. Following an investigation, DHR concluded that a substantial risk of physical injury to child A, child B, and child C was indicated; the mother and the father were referred to counseling but did not attend.
In August 1998, DHR received another report alleging abuse and neglect of the children by the mother and the father. DHR conducted an investigation of the parties' home and found it to be extremely dirty and infested with "roaches and vermin." Allegations of substantial risk of harm, inadequate supervision, and inadequate shelter were found to be indicated. In March 1999, DHR received a report of inappropriate behavior by J.G. in front of child A and child B. Whitley testified that the children had seen J.G. naked and that he had fondled himself while naked in front of the children. At that time, child A was 9 years old.
In November 1999, while child A and child B were living with B.O. and her husband C.O., DHR received a report that C.O. had committed domestic violence against B.O. in front of child A and child B. In February 2000, DHR received a report alleging substantial risk of physical injury to child A and child B when C.O. pulled a knife on B.O. and the father after allegedly finding B.O. and the father in bed together. B.O. and the father denied ever having an affair. Child A and child B did not witness the altercation, but they were removed from B.O. and C.O.'s home and placed in the care of C.W. and R.W., the children's maternal aunt and uncle.
C.W. testified that she had reported the domestic violence in B.O. and C.O.'s home to DHR. The children were placed in C.W. and R.W.'s home in August 2000 and remained in that home until June 2001 when C.W. and R.W. moved to Florida. According to C.W., the father loves the children and regularly visited the children while they were living in C.W.'s home. In March 2000, C.W. reported to DHR that the mother had visited child A and child B at C.W.'s home for five minutes but had abruptly ended the visit and left the home. In approximately June 2000, child A, child B, and child C went to live in B.O.'s home. B.O. and C.O. had separated and B.O. had sought and received a restraining order against C.O.
In August 2000, the children were placed in the custody of the mother. The *Page 1046 
mother returned the children to the father, who then left the children with J.S., the father's mother. J.S., who works full-time, was unable to care for the children and took the children to the home of E.S., the paternal great-grandmother. DHR conducted an evaluation of E.S.'s home during which it discovered that the house was dirty and in need of repair. Becky Cox, a social-service supervisor with DHR, testified that the home was in such poor condition that the children were not permitted to stay in the home of E.S. The children were removed from E.S.'s home and were placed in the home of C.W. and R.W. following a shelter-care hearing.
Michelle Fulmer, a social worker for DHR, was assigned to the case in August 2000. Fulmer testified that DHR offered services to the mother and the father that included counseling, parenting classes, parenting support during supervised visitation, financial assistance, psychological evaluations, and day-care referrals. Whitley testified that the child-care providers arranged on behalf of the mother by DHR, reported that the children were dirty on several occasions and were generally unkempt.
Connie Johnson supervised scheduled visitations between the mother, the father, and the children. The mother and the father alternated Saturdays visiting with the children. Johnson testified that the mother and the father had been consistent in exercising their visitation with the children. Johnson observed that there was no apparent bonding between child A, child B, child C, on the one hand, and the mother and the father, on the other, as would be expected between parents and their children; she stated that there was a slight bond evident between child D and the mother and the father. Johnson further observed that the mother did not have an appropriate parent-child relationship with the children, but instead would act like the children's "buddy."
Johnson testified that, during visits with the mother and the father, the children showed no emotion when the visitation came to an end. According to Johnson, the children did show affection towards the father, but they did not show affection towards the mother. Johnson testified that, on one occasion, the mother smelled of alcohol during her visit and that the visit was cut short. When asked if she had consumed alcohol that morning, the mother stated that she had had four beers the night before her visit but none the morning of her visit. The mother was also late for visits and ended visits early. Johnson testified that the father was not attentive during visitation and occasionally wandered off. In addition, the father cursed in front of the children. Johnson stated that she instructed the mother and the father with regard to their behavior during visitation and that they corrected that behavior. Johnson testified that, at the time of the May 2002 hearing, the mother and the father were doing pretty well with the children.
Wayne Hamberger, a licensed professional counselor, testified that he first began treating the father in December 2000. The father reported to Hamberger that he had consumed alcohol since he was 16 years old and that he and the mother had had a "stormy" relationship. Hamberger counseled the father twice each month, and, according to Hamberger, the father's efforts to attend counseling were genuine and sincere. Hamberger testified that he counseled the father on parenting issues, and he specifically counseled the father on particular issues involved in raising four young girls. After counseling the father, Hamberger testified that he would not recommend that the children be placed with the father as the sole custodial parent. In *Page 1047 
Hamberger's opinion, the father was incapable of parenting on his own.
Laurel Smith, an out-patient therapist with the Mental Health Center, counseled the mother regarding stress management, parenting skills, decision-making, and healthy relationships in general. Smith counseled the mother approximately nine times; the mother missed two of her scheduled appointments.
Smith testified that the mother had been hesitant to discuss and address issues from her past and that that had hindered the mother's progress in counseling. According to Smith, she could not meet the mother's counseling goals without delving into the past. Smith stated that she did not believe that the mother had been honest with her during their counseling sessions. Smith testified that she was not yet in a position to recommend that the mother was capable of being a proper parent. At the time of the May 2002 hearing, Smith could not recommend that the mother be given custody of the children.
David Wilson, a licensed psychologist, performed psychological evaluations on the mother and the father. IQ tests performed on the mother and the father revealed that the mother showed no significant deficits but that the father had a borderline IQ of 71, which revealed significant cognitive limitations. Wilson opined that the father's IQ was indicative of the father's need for help in parenting the children.
Wilson testified that he performed a Minnesota Multiphasic Personality Inventory test on the mother and that the results revealed that the mother had a conscious-deception profile. According to Wilson, this occurs when a person tries to present themselves in an overly positive light without acknowledging any problems. Wilson stated that the mother was not emotionally stable and that both the mother and the father needed to achieve stability in their lives before the children could be returned to their custody. Wilson opined that the mother's and the father's evaluations suggested that they were not able to provide adequate parenting to the children.
Donna Crow, a licensed professional counselor, counseled the children after S.W., the children's foster mother, observed the children engage in abnormal sexual behaviors such as masturbating and demonstrating intercourse behavior with dolls. DHR referred the children to Crow for counseling. Crow testified that in April 2002 child C demonstrated intercourse behavior with dolls but did not have a clear understanding of penetration or how the sexual act would feel. Crow testified that child C had indicated that she had seen the acts she had demonstrated with the dolls but that she had not performed the sexual acts. Crow opined that child C had observed sexual acts between J.G. and the mother or the mother and the father but had not been subjected to sexual abuse. Further, Crow testified that the children had been exposed to pornographic material.
Crow testified that the children do not have a proper parent-child bond with the mother and the father. Although the children like the parents, any bond between them is weakened by the physical distance between them and the amount of time the children spend outside the family home with other relatives. According to Crow, permanency and stability are essential to the children's emotional well-being, but the mother and the father have failed to provide that needed stability to the children. Crow stated that if the mother's and the father's parental rights were terminated, the children could achieve emotional stability. Crow recommended that the children remain together and testified that placement *Page 1048 
with a relative is preferred; however, she stated, that relative placement must be stable.
DHR considered three relative placements: C.W. and R.W., J.S., and B.O. Fulmer testified that C.W. expressed an interest in adopting only child D but that DHR wanted to keep the sibling group together. At the time of the May 2002 hearing, C.W. testified that she was interested in being a placement for the children; C.W. had not informed DHR of her interest prior to that hearing. Fulmer testified that she was concerned that C.W. and R.W. would not be financially capable of taking care of the children. C.W. and R.W. have two children of their own. According to Fulmer, C.W. and R.W. ran out of food when the children were in their home. Further, C.W. and R.W. live in a three-bedroom mobile home that, if the children were to reside with them, would house eight people. The children reported to Fulmer that when they were in the home of C.W. and R.W. they were treated differently than C.W. and R.W.'s two biological children.
DHR investigated placement with J.S., but, Fulmer testified, J.S. did not appear to be willing to take the children. Fulmer testified that B.O. was not a placement alternative because she had allowed the children to witness acts of domestic violence between C.O. and her in her home. As a result of this behavior, Fulmer testified, the children now get upset when they observe any argument. B.O. lives in a two-bedroom mobile home that she shares with the father. B.O. works the third shift at her place of employment; while B.O. is at work, the children are left with C.W., who prepares them for school in the morning. Prior to child D attending kindergarten, Fulmer testified, B.O. would leave snack food lying around the house for child D to eat while B.O. napped. According to Fulmer, the mother stated to her that she did not want the children placed in the home with B.O. and the father. According to Fulmer, the family-placement alternatives offered would be inadequate placements and would fail to meet the children's needs or offer the children needed stability.
At the time of the May 2002 hearing, the children resided with the foster parents; the foster parents have had the children since November 8, 2001. S.W., the children's foster mother, testified that the children's behavior had improved since being in the foster home and that the children were performing well in school. S.W. testified that child A is hesitant to visit the mother but is encouraged to visit; she stated that the other children anticipate visitation.
After the children were removed from the mother and the father's custody, DHR held several Individualized Service Plan ("ISP") meetings with the mother and the father over the course of 17 months and stressed the need to comply with the ISPs. The ISPs provided that the mother and the father attend counseling and participate in supervised visitation with the children, alternating every other Saturday. The mother was required to maintain employment, to notify DHR of changes in her address, and to separate herself from perpetrators of domestic violence, including J.G.
According to Fulmer, the mother missed several ISP meetings, some of which were scheduled at the mother's request; the father attended all scheduled ISP meetings. Whitley testified that the mother failed to keep DHR informed of changes in her employment and that the mother did not faithfully attend counseling sessions as required in the multiple ISPs prepared by DHR. The mother missed several scheduled *Page 1049 
visitations; the father attended all scheduled visitations.
The mother and the father acknowledged and signed a reunification agreement with DHR on March 29, 2002, in which, among other things, they agreed to attend individual counseling, to attend all scheduled visitation, and to submit to a parenting assessment. The mother and the father were informed that failure to follow the reunification agreement could result in the termination of their parental rights. Fulmer testified that, although the mother and the father had attended visitation and had attended counseling, reports from the counselors and those supervising the visitations indicated that the mother and the father had not made any progress. Based on the lack of progress made by the mother and the father and the length of time the children had been in DHR's custody, Fulmer testified, DHR determined that their parental rights should be terminated. According to Fulmer, no other alternative existed other than to terminate the parental rights of the mother and the father. Fulmer testified that DHR plans to place the children for adoption and that the foster parents have expressed a desire to adopt the children.
Following the close of testimony at the May 24 and 25, 2002, hearing, the mother and the father requested a directed verdict. The trial court granted that request and entered a directed verdict finding that the parents had complied with a majority of the terms outlined in the reunification agreement and that the termination of parental rights was not warranted at that time. On November 14, 2002, DHR filed a second petition to terminate the parental rights of the mother and the father.
Before the final hearing on the second termination petition, DHR notified the mother and the father of its intent to introduce the transcript from the May 24 and 25, 2002, hearing into evidence at the January 17, 2003, hearing on DHR's second petition to terminate their parental rights. The day before the final hearing, the mother and the father filed separate motions for extraordinary expenses to purchase a transcript of the prior proceeding. On January 17, 2003, the trial court denied the mother's and the father's motions for extraordinary expenses; that same day the trial court held the second termination hearing and received ore tenus evidence.
The facts elicited at the January 17, 2003, hearing were as follows. Following the May 24 and 25, 2002, hearing, DHR developed a second reunification plan with the mother in which the mother agreed, among other things, to keep DHR informed of any changes in her employment status or address, to maintain reliable transportation, to visit the children during all scheduled visitations, to attend all scheduled counseling visits with Laurel Smith, and to avoid the use of alcohol prior to or during visitation. The mother acknowledged and signed the reunification agreement on June 26, 2002.[3]
The mother testified that she had lived in Carrollton, Georgia, since October 2001, in a two-bedroom mobile home that she rented. The mother stated that she was employed by the "lady down the street" cleaning mobile homes and a church; DHR had not been notified of her change of employment. The mother testified that she earned $250 per week in cash. With that money, the mother was responsible for the payment of $100 per week for her car, $90 per week in rent, $60 per month *Page 1050 
for utilities, and $40 per month for a cellular phone.
The mother testified that she had stopped attending counseling sessions at the time of the final hearing because she felt that she did not need counseling anymore. Before ceasing counseling, the mother attended counseling sessions with Smith, but, according to Smith, she missed several sessions. Smith testified that she suggested the mother find a counselor closer to her home.[4] According to Smith, her counseling sessions with the mother yielded no progress towards the mother's ultimate therapeutic counseling goals.
The mother also attended counseling sessions with Samuel Haskell, a licensed psychologist in Georgia near the mother's home. Haskell counseled the mother regarding parenting skills; the mother completed a recommended parenting class. Haskell testified that the mother attended four scheduled sessions but missed a total of five sessions. Haskell administered a substance-abuse subtle-screening inventory to the mother that revealed that the mother had a high probability of having some form of chemical-dependency or substance-abuse problem. According to Haskell, the mother denied using drugs or alcohol during that time but admitted to abusing alcohol in the past. The mother eventually stopped attending counseling sessions with Haskell.
Kay Morrow, a program supervisor with Family Values Networks, Inc., supervised visitation between the mother, the father, and the children. According to Morrow, the mother missed 3 out of the 18 scheduled visitations that she was required to attend. The mother testified that she missed those three visits with the children because she had to work, her car had a flat tire, and her car would not crank. Morrow stated that the father always attended visitation with the children.
Melissa Washington supervised approximately five visitations between the parents and the children as an employee of Family Values. Washington recounted specific instances of the mother's and the father's conduct during visitations. Washington testified that during the October 26, 2002, visitation, she smelled alcohol on the mother's breath and observed that the mother's speech was slurred and that her appearance was disheveled. The mother denied drinking the day of the visitation, but she stated that she had consumed three or four beers the night before. Washington ended that visitation early.
Washington testified that during an October 5, 2002, visit with the children, the father attempted to watch a movie with the children but the children wanted to play. According to Washington, the father continued to watch the movie while the children played in another room. Washington stated that the father does not interact with the children when he visits. When encouraged to interact with the children, Washington testified, the father was nonresponsive. During another scheduled visitation, the father took a nap while the children played, and, on yet another visitation, the father left the children with Washington to supervise them while the father went to the grocery store. Washington testified that neither the mother nor the father had made any progress in interacting with the children or in developing parenting skills during the visitations.
Hamberger testified that the father faithfully attended counseling sessions. Hamberger observed the father and the *Page 1051 
children during four scheduled visitations. Hamberger observed that there was little interaction between the children and the father and that there was not an intense parent-child bond present between them. According to Hamberger, the father would have great difficulty caring for the children on his own. Hamberger testified that the father would need significant help to adequately parent the children. The father testified that B.O. lives with him in order to assist him and for the purposes of gaining custody of the children. According to the father, B.O. would help him parent the children.
Jacque Snow, a DHR caseworker, testified that the mother had failed to follow the reunification plan implemented in June 2002. The mother missed scheduled visitations, stopped attending counseling sessions, did not inform DHR of her employment change, and did not maintain reliable transportation as required in the reunification plan. Snow testified that DHR reconsidered B.O. as an alternative family placement; however, DHR determined that B.O. would not be a proper placement for the children.
David Wilson performed a psychological evaluation on B.O. that revealed B.O. has an I.Q. of 77 and that she suffers from cirrhosis of the liver related to Hepatitis C. Wilson testified that B.O. admitted her concerns about her ability to care for the children while she worked and in light of her health. B.O. informed Wilson that the father would take care of the children while she was at work.
According to Wilson, B.O. could be a part-time resource for the children but full-time responsibility for the children would be problematic for her. Wilson testified that B.O. only wanted the children temporarily until the children were returned to the mother. B.O. testified that the children should be with the mother. Wilson opined that B.O. does not really want custody of the children.
Snow testified that B.O.'s health and her employment during the third shift concerned DHR. According to Snow, the guardian ad litem, social workers, mental-health-care professionals, and supervisors with DHR were all involved in reaching the decision that B.O. was not a proper placement for the children. Snow testified that DHR had exhausted all other viable alternatives to terminating the parental rights of the mother and the father as of the January 17, 2003, hearing.
Donna Crow, the children's counselor, testified that child A and child B had experienced distress over visitation with the mother and the father; child A and child B refused to attend visitation although they were encouraged to attend. In light of this distress, Crow testified, child A and child B particularly needed a determination as to custody while child C and child D did not have that great of a need for a custody determination. According to Crow, the children are in need of permanency and stability and, she stated, that if they do not receive both, their future emotional stability could be adversely affected. Crow testified that the children are doing well in their foster home.
Child A, who was 12 years old at the time of the January 2003 hearing, testified that she quit visiting the mother and the father although she was encouraged to attend visitation. Child A testified that she stopped going to visits because she did not see the point in going. According to child A, the mother and the father were not the parents that they should have been to the children.
Child A testified that she and the other children would like to stay with the foster parents. Child A stated that she did not *Page 1052 
feel comfortable living with B.O. because of the physical violence she had witnessed between B.O. and C.O.; the violence happened almost every day according to Child A. Although B.O. and C.O. were no longer married, Child A testified that she did not feel safe living with B.O. Child A further testified that she understood that the termination of the mother's and the father's parental rights was a permanent decision.
On appeal, the mother and the father assert that the trial court erred in terminating their parental rights. The mother and the father also contend that the trial court failed to consider other viable alternatives to the termination of their parental rights. A trial court's determination of factual issues following the presentation of ore tenus evidence is presumed to be correct and will not be disturbed on appeal absent a showing of palpable error. F.L.L. v. State Dep't of Human Res., 612 So.2d 501
(Ala.Civ.App. 1992). Section 26-18-7, Ala. Code 1975, which sets forth the statutory authority for the termination of parental rights, provides:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreated the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"[Listing offenses.]
 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following: *Page 1053 
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
This court has stated:
 "Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent's custody would be in the best interests of the child. M.H.S. v. State Dep't of Human Resources, 636 So.2d 419
(Ala.Civ.App. 1994).
 "`The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala. Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala. Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala. Code 1975.'
 "M.H.S. v. State Dep't of Human Resources, 636 So.2d at 421.
 "Where a nonparent petitions to terminate a parent's parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep't of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id."
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App. 1997).
Before initially seeking custody of the children but after receiving reports of abuse and neglect of the children, DHR provided the mother and the father with numerous services; DHR had been involved with the family since 1990. While still in the custody of the mother and the father, the children were shuffled between the homes of relatives, and, in most instances, *Page 1054 
the children were separated from each other. The children's residence was subject to the status of the mother and the father's relationship; when the parties separated, the mother moved in with J.G. When the mother was not with J.G., whom she claims abused her, she moved back to live with the father. The children, while in the company of J.G., apparently observed acts of domestic violence and sexually explicit acts, both of which had an adverse effect on them.
The record indicates that child A, child B, and child C were in the custody of DHR for 20 months before DHR first sought to terminate the parental rights of the mother and the father; child D was in the custody of DHR for approximately 12 months. After the children were placed in DHR's custody and adjudicated dependent, DHR initiated several ISPs with the mother and the father; DHR also developed reunification plans for the mother and the father. Testimony revealed that the father faithfully visited the children, attended counseling sessions, and abstained from the use of alcohol prior to visiting the children, all of which were required in the reunification plan. The mother, however, missed several visitations, failed to consistently attend counseling, and later quit attending counseling because, she said, she saw no point in going. According to DHR, the mother smelled of alcohol during one scheduled visitation with the children; alcohol use prior to or on the day of visitations was prohibited pursuant to the reunification plan. Both the mother and the father acknowledged and understood the importance of following the reunification plan.
Testimony from those who supervised the mother and the father during visitations revealed that the mother and the father had failed to make any progress with regard to parenting skills and interaction with the children. During visitations with the children, interaction between the mother and the children demonstrated that she did not have an appropriate parent-child relationship with the children; the same was true for the father. The children did not show either the mother or the father affection, and eventually child A and child B refused to attend visitations. According to observers, the children did not have a close bond with the mother and the father. During multiple visitations, the father demonstrated his inability to adequately parent the children alone. The father had taken a nap and had left during visitations.
Psychological evaluations of the mother and the father revealed that neither were able to provide adequate parenting for the children. The mother was found to be emotionally unstable. According to the father's counselor and the results of the father's psychological evaluation, the father would need significant help to adequately parent the children; the father could not parent the children alone.
The record indicates that DHR investigated several family-placement alternatives. Fulmer testified that J.S., the paternal grandmother, was not willing to take the children. J.S. worked full-time and demonstrated her inability to care for the children when she dropped the children off at the home of E.S., the paternal great-grandmother, who, in light of her age and poor health, was clearly incapable of adequately caring for the children. A home evaluation revealed that E.S.'s home was in poor condition and was in need of repair. C.W. and R.W., the maternal aunt and uncle, were also considered as family-placement alternatives. C.W. testified, at the January 17, 2003, hearing, that she was interested in adopting all of the children; however, she had previously informed DHR that she was only willing to *Page 1055 
adopt child A. DHR determined that the children should be placed in a home together and should not be separated. C.W. and R.W. had demonstrated that they were unable to adequately care for all of the children because of their limited financial resources.
DHR also investigated B.O., the maternal grandmother; however, after a thorough investigation, B.O. was found not to be a viable family-placement alternative. B.O. resides with the father and works the third shift at her place of employment. When the children lived with B.O., the children stayed with C.W. and R.W. at night while B.O. was at work. The children had regularly witnessed domestic violence between B.O. and C.O.; testimony revealed that that had adversely affected the children. Child A testified that she would not feel safe living in B.O.'s home.
A psychological evaluation of B.O. revealed that she had concerns about her ability to care for the children. According to B.O., the father would care for the children while she was at work; however, the father had been determined to be incapable of caring for the children alone. The report of the psychological evaluation concluded that B.O. did not want custody of the children. Indeed, B.O. testified that the children should be with the mother.
The trial court initially denied DHR's petition to terminate parental rights, thus extending the time the mother and the father had in which they could continue to demonstrate a willingness to gain custody of the children by following the reunification plan and ISPs that were put in place by DHR. The mother clearly failed to follow the second reunification plan and had made no progress in her parenting skills and her interaction with the children during visitations. Although the father complied with DHR's requests, he too had made no progress in his parenting skills or his interaction with the children during visitations. Although it is clear that the father made a concerted effort to gain custody of the children, the evidence supports a conclusion that the father is incapable of parenting the children alone. Thus, we must conclude that DHR's continued efforts to rehabilitate the mother and the father failed.
Child A, child B, and child C had been in the custody of DHR for 20 months; child D had been in the custody of DHR for approximately 12 months. At the time of the final hearing in this matter, the children were ages 12, 9, 7, and 5. By all accounts, the children had suffered from a lack of permanency and stability in their lives. According to the testimony, that lack of permanency and stability could adversely affect the children's future emotional stability if allowed to continue uncorrected. Child A testified that the mother and the father had not been the parents they should have been to her and her siblings and that it was the children's desire to live with the foster parents. Given all of the evidence in the record on appeal, this court cannot say that the trial court's termination of the mother's and the father's parental rights was plainly and palpably wrong. SeeA.R.E. v. E.S.W., supra.
The mother also contends on appeal that the trial court erred by denying her motion for extraordinary expenses so that the mother could purchase a transcript of the May 24 and 25, 2002, hearing. Regardless of the mother's ability to purchase the transcript, the mother asserts that the trial court erred by not allowing her to review the transcript before the trial court admitted it into evidence and that admitting the transcript of the May 24 and 25, 2002, hearing into evidence was reversible error. The mother asserts that her inability to review the transcript and *Page 1056 
the admission of the transcript into evidence violated her due-process rights.
The record reveals that the mother and the father filed motions for extraordinary expenses to purchase a transcript of the May 24 and 25, 2002, hearing on January 16, 2003, one day before the final hearing. The motions were brought to the trial court's attention on the day of the hearing, before the first witness was called to testify. The trial court denied the motions in light of the fact that the hearing was to begin shortly and it was too late to obtain a copy of the transcript at that time. A certified copy of the May 24 and 25, 2002, transcript was offered and admitted into evidence during the final hearing.
Our review of the transcript from the May 24 and 25, 2002, hearing, reveals that the mother was present at the hearing and was represented by the same counsel that represented her during the January 17, 2003, hearing. Twelve witnesses testified at the May 24 and 25, 2002, hearing; six of the witnesses from the first hearing testified at the final hearing. The issue at both hearings was identical, i.e., the termination of the mother's parental rights. The same judge presided over both hearings. Furthermore, the mother was afforded an opportunity to cross-examine the witnesses at the first hearing.
"`The trial court's decision to admit or to exclude evidence is within its sound discretion, and that decision will not be reversed on appeal absent a showing of an abuse of discretion.'"B.S.L. v. S.E., 826 So.2d 890, 894 (Ala.Civ.App. 2002), quotingRoberts v. Roberts, 802 So.2d 230, 236 (Ala.Civ.App. 2001). Further, even if the trial court erred in admitting the transcript into evidence, the trial court's judgment will not be reversed on appeal "unless . . ., after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties." Rule 45, Ala. R.App. P.
Contrary to the mother's assertion on appeal, her due-process rights were not violated when the trial court admitted the transcript into evidence. The mother was afforded an opportunity to cross-examine the witnesses at the May 24 and 25, 2002, hearing; she was able to confront six of those same witnesses a second time at the January 17, 2003, hearing. Further, the trial court's denial of the mother's motion for extraordinary expenses to purchase the transcript of the prior hearing was not error in light of the mother's delay in filing her motion and her presence at the prior hearing. The mother has failed to demonstrate how the admission of the transcript "injuriously affected" her "substantial rights." See Rule 45, Ala. R.App. P. Therefore, we find the trial court did not abuse its discretion in admitting the May 24 and 25, 2002, transcript into evidence at the January 17, 2003, hearing.
AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.
CRAWLEY and MURDOCK, JJ., concur in the result.
[1] Child A, child B, and child C were adjudicated dependent on September 25, 2000, and were placed in the custody of DHR by agreement of the parties; child D was adjudicated dependent on July 16, 2001.
[2] The record does not reference the amount of money the father paid in child support, when the child-support payments were made, or the duration of the child-support payments.
[3] It appears from the record that the father did not sign a second reunification agreement following the May 24 and 25, 2002, hearing.
[4] Smith practiced as a licensed counselor in Anniston, Alabama; the mother lived in Georgia.