REL:  December 15, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

_____

## CL-2023-0272

_____

## P.R.

## v.

## Houston County Department of Human Resources

## Appeal from Houston Juvenile Court
## (JU-19-169.03)

EDWARDS, Judge.

In December 2022, the Houston County Department of Human Resources ("DHR") filed in the Houston Juvenile Court ("the juvenile court") a petition seeking to terminate the parental rights of P.R. ("the mother") to T.C. "(the child").  After a trial held on April 20, 2023, the

juvenile court entered a judgment terminating the mother's parental rights. She timely appealed that judgment to this court.

The grounds warranting a termination of parental rights are set forth in § 12-15-319, Ala. Code 1975, a part of the Alabama Juvenile Justice Act ("the AJJA"), § 12-15-101 et seq., Ala. Code 1975. Section 12-15-319(a) provides, in pertinent part:

> "If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[]. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child. In determining whether or not the parent[] [is] unable or unwilling to discharge [his or her] responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
>
> > "….
>
> > "(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for the needs of the child.

2

"....

"(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parent[] have failed.

"....

"(9) Failure by the parent[] to provide for the material needs of the child or to pay a reasonable portion of support of the child where the parent is able to do so.

"(10) Failure by the parent[] to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.

"(11) Failure by the parent[] to maintain consistent contact or communication with the child.

"(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.

"(13) The existence of any significant emotional ties that have developed between the child and his or her current foster parent or

3

parents, with additional consideration given to the following factors:

> "a. The length of time that the child has lived in a stable and satisfactory environment.
>
> "b. Whether severing the ties between the child and his or her current foster parent or parents is contrary to the best interest of the child.
>
> "c. Whether the juvenile court has found at least one other ground for termination of parental rights."

In addition to determining whether a child is dependent and whether grounds exist under § 12-15-319 to support a termination of parental rights, a juvenile court must also "properly consider and reject all viable alternatives to a termination of parental rights." B.M. v. State, 895 So. 2d 319, 331 (Ala. Civ. App. 2004).

Although a juvenile court's factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct, K.P. v. Etowah Cnty. Dep't of Hum. Res., 43 So. 3d 602, 605 (Ala. Civ. App. 2010), "[t]his court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile

4

court are supported by evidence that the juvenile court could have found to be clear and convincing." K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016). That is, this court

> "'must ... look through ["the prism of the substantive evidentiary burden," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986),] to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'"

K.S.B., 219 So. 3d at 653 (quoting Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008), quoting in turn Ala. Code 1975, § 25-5-81(c)).

Our review of the record reveals the following facts. Torrie Nelson, a DHR employee, testified that she had been the mother's caseworker from December 2018 until October 2020 and that DHR's involvement with the mother had begun when DHR received a report indicating that the mother was using illegal substances in the presence of her four children. Nelson said that, after investigating the report, DHR found the mother "indicated" for "chemical endangerment." See Ala. Code 1975, § 26-14-8(a)(1). She explained that, in December 2018, the mother entered into a safety plan with DHR, pursuant to which the child was placed in

the care of N.B., a maternal great-aunt; Nelson testified that, in January 2020, the child was placed with "another maternal great-aunt, another family member, relatives of the child," who had apparently secured a provisional foster-care license.[1] Nelson then testified that, on March 8, 2020, the juvenile court awarded custody of the child to the mother's great-grandmother, F.R. ("the maternal great-great grandmother").

According to Nelson, in October 2018, the mother participated in an individualized-service-plan ("ISP") meeting at which she agreed to submit to a substance-abuse assessment and to random drug testing. Nelson said that, at a January 2019 ISP meeting, the mother agreed to continue to submit to random drug tests, to complete a substance-abuse assessment and to follow the recommendations resulting from that assessment, and to undergo a parenting assessment. Although Nelson

---

[1]Nelson did not initially provide the names of the relatives with whom the child was placed. However, when she was later asked the names of the previous custodians of the child under the safety plan, she replied with only one name -- N.B. In fact, during further questioning, Nelson appeared to indicate that the child had had only two previous placements or custodians -- the maternal great-great grandmother and N.B. -- despite her initial testimony indicating that the child had had two different relative placements before the juvenile court awarded custody to the maternal great-great grandmother.

testified that the mother had complied with services "for a while," she said that the mother had not attended most of the random drug tests that Nelson had requested.

Nelson described the mother as uncooperative and her behavior as unpredictable. Nelson said that, at times, she had believed that she had developed a rapport with the mother, resulting in the mother's cooperation but that, at other times, the mother's behavior had been erratic. She explained that she had witnessed the mother threatening other DHR personnel and having outbursts at ISP meetings. In addition, Nelson testified that a March 2020 ISP meeting had to be suspended because of the aggressive behavior of the mother's boyfriend, P.G. According to Nelson, she and a supervisor had discussed P.G.'s behavior with the mother, and, in response, the mother had stated that she no longer desired to participate in DHR's services. As a result, Nelson explained, the mother had not participated in services offered through DHR through at least October 2020, when Nelson ceased to be the mother's caseworker. Nelson testified that, in October 2020, DHR had assumed custody of the child after the maternal great-great grandmother

7

permitted the child to have unsupervised contact with the mother in violation of the safety plan. The record contains a shelter-care order entered in case number JU-19-169.02 on October 16, 2020; that order reflects that the child's custodian at that time was the maternal great-great grandmother. The record also contains the dependency order entered by the juvenile court in case number JU-19-169.02 in February 2022 that found the child dependent as to the mother and the maternal great-great grandmother and transferred custody of the child from the maternal great-great grandmother to DHR.

Nelson testified that her concerns during her tenure as caseworker for the mother included the mother's potential continuing use of illegal substances. Although Nelson said that the mother had admitted only to using marijuana, Nelson indicated that the mother's erratic conduct had led to her concern that the mother had been abusing various illegal substances. Nelson further testified that the mother had admitted that her relationship with P.G. included acts of domestic violence. Nelson said that the mother's admission of domestic violence had raised concerns about the mother's stability and protective capacity. In addition, Nelson

explained that other concerns that she had had regarding the mother included the mother's history with DHR, the number of "indicated" findings relating to the mother, and the mother's lack of cooperation with DHR.

Nelson testified that, as far as she could recall, she had not been provided with a list of potential relative resources by the mother. She said that, if she had received such a list, she would have assessed those relatives for potential placement; however, she indicated that she had no recollection of having done so. She testified that an "Accurint" search was conducted by another caseworker and that it had not yielded any potential resources that she could recall. She also testified that the fact that the maternal great-great grandmother had violated the safety plan by allowing the mother to have unsupervised contact with the child indicated a lack of protective capacity on the maternal great-great grandmother's part and precluded her from further consideration as a relative resource. Nelson never stated the reason that the child had been removed from the physical custody of the maternal great-aunt or the other "relative" that had assumed placement of the child.

Rae Bryan testified that she had served as a DHR supervisor over the mother's case throughout the entire period that it had been active and that she had also served as a caseworker for the mother's case between June 2021 and November 2021 and again beginning in February 2022 until November 2022. She explained that her concerns regarding the mother were that "the parent lacked parenting and the lack of behavioral control and also [that she] lacked parenting knowledge and skills and motivation that affect the child's safety as well." She testified that the child, who was 5 years old at the time of the trial, had been in the custody of DHR and in foster care for a total of 30 months.

According to Bryan, the mother had attended several ISP meetings between October 2020 and June 2021 but had not completed any of the services that she had agreed to complete. Bryan specifically testified that the mother had not managed to rehabilitate herself to achieve reunification because the mother had not "[taken] advantage of services that [DHR had] offered, [had not] controll[ed] her behavior, and lack[ed] protective and parental capacities." Bryan did not expound on the mother's lack of protective or parental capacities. She testified that, like

Nelson, she had observed the mother's difficult behavior. She explained that she had witnessed the mother's becoming irate when she was asked to submit to a drug test. Bryan described the mother as having become very upset and said that a security guard had had to escort the mother from the building.

Bryan said that she had observed visits between the mother and the child and that the mother had usually spent most of the visits concerned with her two other children, whom she was also visiting. She said that the mother would typically spend some time with the child at the conclusion of a visit but, she said, during most of the visit the child had interacted with a cellular telephone or a video game. Bryan also testified that the mother had not been permitted to visit with the child after December 23, 2021, because she had been banned from the DHR office "due to safety risks for the children" and that the mother had not thereafter requested that she be allowed to visit with the child.

Bryan indicated that she had not been able to contact the mother to invite her to the February 2022 ISP meeting. She said that she had driven to the mother's address on two occasions and had not found

11

anyone at home either time. Bryan said that, because she had not found anyone at the mother's residence, she had not mailed an invitation to the February 2022 ISP meeting to that address. She testified that she had made telephone calls to the mother and that she had not received an answer or a return call. She said that the mother had not contacted DHR at all after February 11, 2022.

Bryan further testified that she had performed an Accurint search for potential relative resources. When asked if the search had identified any other relatives of the mother, Bryan did not answer the question. Instead, when asked if that search had yielded any potential relative resources, Bryan testified that "the only other relative that contacted us was an aunt out of Texas." According to Bryan, the Texas relative had indicated interest but had failed to complete and return necessary paperwork to institute a home study pursuant to the Interstate Compact for the Placement of Children ("ICPC"), Ala. Code 1975, § 44-2-20 et seq.

The mother admitted that she had had a drug problem in 2018 and 2019 when she "was stressed out and … was going through a lot from [DHR] stepping into [her] life." She testified, however, that she had quit

using drugs in 2020. Although she admitted that she and P.G. had gotten into arguments, she denied that they ever "fought each other" and denied having ever told Nelson that she or P.G. had engaged in domestic violence during their relationship.

The mother also admitted that she had a criminal history. Although she said that she had been arrested in 2018 for trespassing, she indicated that she did not recall the underlying facts leading to that arrest. She said that she had pleaded guilty to obstruction of justice in July 2022, that she had been sentenced to serve 24 months' incarceration, that her sentence had been suspended, and that she had been placed on probation. She further admitted that she had violated her probation and that she had been required to serve her 24-month sentence in the Houston County Community Corrections Center. In addition, the mother testified that she had been arrested and charged with making a terroristic threat against DHR; she said that she had pleaded guilty to a lesser charge of harassment in October 2022. The mother explained that her plea of guilty in October 2022 resolved both the terroristic-threat charge and the 2018 trespassing charge. Finally, the mother admitted

that she had been arrested in October 2022 on a charge of possession of a controlled substance when she was found to be in possession of methamphetamine during a traffic stop. The record contains November 2022 orders entered by the Houston Circuit Court revoking the mother's probation and ordering her to serve the remainder of her 24-month sentence in Houston County Community Corrections.

Although she admitted that she "sometimes didn't cooperate with DHR" and that she had not been compliant with services during the first two years of DHR's involvement, the mother said that she had been taking "drug classes" and that she was compliant with SpectraCare counseling, which is presumably counseling that was required by Houston County Community Corrections. She denied having made any threats toward DHR personnel. She said that she had shown "a lot of emotion by crying and frustration." She admitted, however, that she had pleaded guilty to the harassment charge arising from DHR's accusation that she had threatened DHR personnel.

The mother indicated that she had provided DHR with a list of relatives. She testified that, in her opinion, DHR had not contacted those

14

relatives because, she said, the relatives kept calling her and asking whether she had spoken with her social worker. She also indicated that certain relatives had attempted to intervene in the termination-of-parental-rights action. In fact, the record reflects that seven persons -- the maternal great-great grandmother, L.W., A.B., C.T., C.H., J.K., and C.M. -- filed pro se motions to intervene. The motions filed by the maternal great-great grandmother, L.W., A.B., C.T., C.H., and J.K. were all handwritten and stated, generally, that each potential intervenor was willing and able to assume placement and/or custody of the child. C.T. is an aunt of the mother; L.W. described herself as the child's cousin; A.B. explained that she was the child's maternal second cousin and stated that she loved the child "like her own"; C.H. stated that the child was very familiar with her; and J.K. stated that she had tried contacting "you guys," which, presumably, was a reference to DHR, "over and over." The motion filed by C.M. was typewritten, identified her as the child's biological aunt, and stated that she had "a sustained, substantial and sincere interest in the welfare of the child." DHR filed no response to any of the motions to intervene. The juvenile court denied each of the seven

15

motions to intervene without elaboration within a week after each was filed.

The mother admitted that, on the advice of her criminal attorney, she had not maintained contact with DHR for several months after DHR swore out the warrant alleging that the mother had made a terroristic threat. She said that, after she had resolved that criminal charge by pleading guilty to harassment in October 2022, she had attempted to contact DHR. She said that her telephone calls were never answered and that she had not received any response to voicemails that she had left for her caseworkers. She admitted that, because she was incarcerated at the Houston County Community Corrections Center, she had not been living at the residence at the address that DHR had for her. However, she said that she still received her mail at that address.

The mother opined that she would soon be released from Houston County Community Corrections because she was in compliance with the requirements of that program. She testified that she had two jobs, but she later indicated that she had only one job. Although she testified that she could live with an unnamed aunt after her release, she said that she

16

was making efforts to secure her own residence and that she might, in fact, be able to secure that residence before she was released. She explained that she had received an income-tax refund of either $11,000 or $15,000 and that that refund had been seized and used to satisfy her child-support obligation.

On appeal, the mother first challenges the sufficiency of the evidence supporting the conclusion that she was, as of the time of the trial, unable or unwilling to perform her responsibilities as parent of the child. Secondly, the mother argues that the juvenile court could not have concluded that no viable alternative to the termination of her parental rights existed because DHR had not established that it had investigated and rejected all the mother's relatives. We find the mother's second argument dispositive of this appeal.

DHR is required to investigate potential relative resources to determine whether there exists a viable alternative to the termination of a parent's parental rights. See Ex parte J.R., 896 So. 2d 416, 428 (Ala. 2004).

> "With regard to the possibility of placing a child with a relative as an alternative to the termination of a parent's

17

parental rights, this court has held that '"'DHR must present "evidence of recent attempts to locate viable alternatives in order to establish that termination of parental rights is the least dramatic alternative."'"' J.F.S. v. Mobile Cnty. Dep't of Hum. Res., 38 So. 3d 75, 78 (Ala. Civ. App. 2009) (quoting C.T. v. Calhoun Cnty. Dep't of Hum. Res., 8 So. 3d 984, 987 (Ala. Civ. App. 2008), quoting in turn V.M. v. State Dep't of Hum. Res., 710 So. 2d 915, 921 (Ala. Civ. App. 1998), quoting in turn Bowman v. State Dep't of Hum. Res., 534 So. 2d 304, 306 (Ala. Civ. App. 1988)) (emphasis omitted). See also V.M. v. State Dep't of Hum. Res., 710 So. 2d 915 (Ala. Civ. App. 1998) (same). DHR, and not a possible relative custodian, has the burden of initiating an investigation into the suitability of a possible relative placement for a child. D.S.S. v. Clay Cnty. Dep't of Hum. Res., 755 So. 2d 584, 591 (Ala. Civ. App. 1999)."

A.R.H.B. v. Madison Cnty. Dep't of Hum. Res., [Ms. CL-2022-0541, Dec. 16, 2022] ___ So. 3d ___, ___ (Ala. Civ. App. 2022).

Certainly, a potential resource may not be viable for many reasons, including lacking a relationship with the child at issue, medical issues, lack of financial ability, conduct, or a lack of protective capacity. See, e.g., C.P. v. Cullman Cnty. Dep't of Hum. Res., 203 So. 3d 1261, 1268 (Ala. Civ. App. 2016) (determining that juvenile court could have rejected a paternal grandmother as a suitable custodian because she had enabled the father's behavior and had medical issues); B.D.S. v. Calhoun Cnty. Dep't of Hum. Res., 881 So. 2d 1042, 1055 (Ala. Civ. App. 2003)

18

(determining that a juvenile court could have rejected certain relatives because of the lack of financial ability to assume custody of a sibling group and another relative because of evidence indicating that the children had witnessed domestic violence in that relative's home). In addition, the juvenile court may consider whether a particular relative placement will serve the best interest of the child. See D.F.H. v. State Dep't of Hum. Res., 51 So. 3d 1081, 1091 (Ala. Civ. App. 2010) (determining that a juvenile court could properly reject relatives as placement alternatives when the children did not desire to be placed with those relatives and threatened to run away if placed in their home). However, the record must contain evidence supporting the basis for the rejection of a potential relative resource.

In addition, a juvenile court may reject a potential relative resource if the permanency plan for the child is adoption by current foster parents and if the relative "did not attempt to care for the child or obtain custody of the child within four months of the child being removed from the custody of the parents or placed in foster care, if the removal was known to the relative." Ala. Code 1975, § 12-15-319(c)(1). We have recently

explained that § 12-15-319(c) does not "alleviate[] DHR's burden of locating and investigating possible relative resources for a child." A.R.H.B., ___ So. 3d at ___. Of course, the record must contain evidence to support the juvenile court's application of § 12-15-319(c). Id.

DHR asserts that it established that its personnel had failed to locate potential relatives and also contends that the juvenile court's denial of the several motions to intervene supports the juvenile court's conclusion that no viable alternative to the termination of the mother's parental rights existed. The record in the present case contains only minimal information regarding DHR's attempts to locate potential relative placements for the child. Although Nelson explained that the maternal great-great grandmother's failure to abide by the safety plan prevented her consideration as a permanent relative resource, Nelson could not recall whether she had been provided a list of potential relatives or, if she had, whether she had assessed any other persons as potential placements, as was her usual practice. Bryan indicated that she had performed a search for potential relatives of the mother, but she never answered the question regarding what that search yielded. Neither

20

caseworker could recall the names of any potential relatives other than the maternal great-aunt and the maternal great-great grandmother and neither caseworker testified that any of the relatives who attempted to intervene, other than the maternal great-great grandmother, were unsuitable. In fact, neither Nelson nor Bryan indicated that they were aware of the existence of any of the potential intervenors, except for the maternal great-great grandmother. In addition, DHR did not file any responses to the motions to intervene. The juvenile court did not hold a hearing on any of the motions to intervene, so it could not have determined whether those relatives had made attempts to contact DHR or to offer to care for the child at any point during the pendency of the underlying dependency action or when any of those relatives learned about the child's removal from the custody of the mother. Given Nelson's equivocal testimony regarding whether the mother provided the names of relatives to DHR, Bryan's failure to affirmatively testify regarding the results of the Accurint search when questioned about it, the mother's testimony that she had provided a list of relatives to DHR, the mother's testimony that DHR had not contacted those relatives, and the fact that

21

six additional persons moved to intervene in the termination-of-parental-rights action, the record lacks clear and convincing evidence that DHR performed its duty to investigate potential relative resources or to support the juvenile court's conclusion that no viable alternatives to the termination of the mother's parental rights existed.

Accordingly, because DHR failed to present evidence to support a conclusion that DHR properly investigated viable alternatives to the termination of the mother's parental rights, we reverse the juvenile court's judgment.  See A.R.H.B., ___ So. 3d at ___.

REVERSED AND REMANDED.

Moore, Hanson, and Fridy, JJ., concur.

Thompson, P.J., dissents, with opinion.

CL-2023-0272

THOMPSON, Presiding Judge, dissenting.

I respectfully dissent from the majority's decision to reverse the judgment of the Houston Juvenile Court ("the juvenile court") terminating the parental rights of P.R. ("the mother") to T.C. ("the child").

Our supreme court and this court have repeatedly held that an appellate court will not reverse a trial court on a ground neither presented to the trial court nor argued by the appellant on appeal as a basis for reversal. Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala. 1992); see also Kids Klub, Inc. v. State Dep't of Hum. Res., 874 So. 2d 1075 (Ala. Civ. App. 2003)(explaining that this court will not reverse on a ground not argued on appeal); and Morris v. Padgett, 890 So. 2d 157 (Ala. Civ. App. 2004)(observing that this court will not create a legal argument for the parties). Rule 28(a)(10), Ala. R. App. P., provides that an appellate argument must contain supporting authority for the grounds upon which an appellant seeks reversal of a judgment. See also S.B. v. Saint James Sch., 959 So. 2d 72, 89 (Ala. 2006) (stating that general propositions of law are not considered "supporting authority" for purposes of Rule 28).

23

The majority reverses the juvenile court's judgment in favor of the Houston County Department of Human Resources ("DHR") "because DHR failed to present evidence to support a conclusion that DHR properly investigated viable alternatives to the termination of the mother's parental rights." ___ So. 3d at ___. The mother, however, did not present this argument in the juvenile court or on appeal.

In the juvenile court, the mother did not file any pleadings or argue at the final hearing that DHR did not adequately investigate viable alternatives to the termination of her parental rights. Consequently, I do not believe that the mother sufficiently apprised the juvenile court of the reason upon which the majority bases its reversal. See Ex parte Works, 640 So. 2d 1056, 1058 (Ala. 1994)(recognizing that the purpose of objections at trial is to provide the trial court with an opportunity to correct an alleged error before a judgment is issued). In her brief on appeal, the mother cites general propositions of law addressing family integrity and the need to explore less drastic measures and to examine viable alternatives to termination of a parent's parental rights. She then offers two paragraphs in support of her contention that "a viable

24

alternative did in fact exist." She references her testimony that relatives are available, the motions to intervene filed by seven relatives two months before the final hearing, the lack of evidence explaining the juvenile court's reason for denying the motions to intervene, and the testimony of Torrie Nelson, a DHR caseworker, who stated that she could not recall specific facts about possible relatives other than two relatives who were part of an earlier safety plan. I cannot conclude that the mother's general statement in her appellate brief that "DHR … failed to assess all of those individuals" without citation to any law establishing that DHR has a duty to investigate potential relative resources adequately presents a legal argument supporting reversal of the juvenile court's judgment.

> "'"It is not the function of the appellate courts to develop, research, and support an appellant's arguments."' Knight v. Knight, 214 So. 3d 1207, 1210 (Ala. Civ. App. 2016)(quoting M.F. v. W.W., 144 So. 3d 366, 368 (Ala. Civ. App. 2013)). Furthermore,
>
>> "'[i]n the absence of an argument supported by legal authority, an alleged error of law committed by a trial court is considered "essentially unchallenged on appeal." [Walden v.

> Hutchinson, 987 So. 2d 1109, 1120 (Ala. 2007)]. An appellant waives the right to appellate review of a ruling on a question of law when the appellant fails to cite any legal authority on that point as required by Rule 28(a)(10), Ala. R. App. P. <u>Slack v. Stream</u>, 988 So. 2d 516, 533-34 (Ala. 2008). This court cannot cure that deficiency by creating legal arguments for the appellant, <u>see</u> <u>Spradlin v. Spradlin</u>, 601 So. 2d 76, 78-79 (Ala. 1992), because it is not the function of this court to perform an appellant's legal research. <u>City of Birmingham v. Business Realty Inv. Co.</u>, 722 So. 2d 747, 752 (Ala. 1998).'
>
> "<u>State v. Pressley</u>, 100 So. 3d 1058, 1070-71 (Ala. Civ. App. 2012)(Moore, J., dissenting)."

<u>Watkins v. Lee</u>, 227 So. 3d 84, 90 (Ala. Civ. App. 2017)

Accordingly, because the mother did not argue in the juvenile court and, in my opinion, the mother does not adequately argue on appeal the reason upon which the majority reverses the juvenile court's judgment, I am not inclined to reverse the juvenile court's judgment for the reason set forth by the majority.

Moreover, even if I agreed that consideration of this ground was proper, I conclude that any error created by not requiring DHR to

investigate the mother's proposed relative placements was harmless. In my opinion, sufficient evidence supports the juvenile court's determination that termination of the mother's parental rights was in the best interest of the child.

A parent's attempt at reunification should be accomplished in a timely manner. Talladega Cnty. Dep't of Hum. Res. v. M.E.P., 975 So. 2d 370, 374 (Ala. Civ. App. 2007)(explaining that "there is a point at which the child's need for permanency and stability will overcome the parent's rights to rehabilitation by [the Department of Human Resources]"). Generally, a parent's rehabilitation should be accomplished within 12 months of the removal of the child or children from the home. M.A.J. v. S.F., 994 So. 2d 280, 291 (Ala. Civ. App. 2008)(stating that, "when [the Department of Human Resources] timely exerts reasonable rehabilitation and reunification efforts, the parents generally shall have 12 months from the date the child enters foster care to prove that their conduct, condition, or circumstances have improved so that reunification may be promptly achieved").

In this case, the record includes clear and convincing evidence that the mother had not meaningfully cooperated with DHR by adjusting her circumstances to meet the needs of the child. DHR became involved with the mother and the child after receiving a report indicating that the mother was using illegal substances in the child's presence. After an investigation, the mother was "indicated" for "chemical endangerment." The child has been out of the mother's care since 2018 and in DHR's custody for 30 months. During that time the mother has not participated consistently in DHR services, which included drug testing, and, most significantly, had been arrested and convicted for possession of an illegal substance within eight months of the final hearing. The juvenile court could have considered the mother's failure to rehabilitate herself within that typical 12-month period and her recent arrest and conviction for possession of an illegal substance to be evidence indicating that the mother would not, in the foreseeable future, be free from the conduct or condition that resulted in the child's removal from the home. Thus, the juvenile court had sufficient evidence to support its conclusion that the mother had not adjusted her circumstances to meet the needs of the child

28

and that her conduct or condition was unlikely to change in the foreseeable future.[2] See M.W. v. Houston Cnty. Dep't of Hum. Res., 773 So. 2d 484, 487 (Ala. Civ. App. 2000)("At some point, however, the child's need for permanency and stability must overcome the parent's good-faith but unsuccessful attempts to become a suitable parent.").

Additionally, although "a juvenile court cannot terminate parental rights when a viable alternative exists," see K.R.S. v. DeKalb Cnty. Dep't of Hum. Res., 236 So. 3d 910, 914 (Ala. Civ. App. 2017), the existence of a relative as a potentially viable placement alternative does not, in and of itself, prevent the juvenile court from terminating the mother's parental rights. For example, § 12-15-319(c), Ala. Code 1975, provides:

> "The juvenile court is not required to consider a relative to be a candidate for legal guardian of the child in a proceeding for termination of parental rights if both of the following circumstances exist:

---

[2]In general, courts disfavor leaving a child in foster care indefinitely while a parent continues to make attempts at reunification. D.V. v. Colbert Cnty. Dep't of Hum. Res., 121 So. 3d 370, 380-81 (Ala. Civ. App. 2012). The mother has not argued that any exception to that general rule should apply under the facts of this case, and the record contains no evidence that the mother's condition would improve in the foreseeable future.

"(1) The relative did not attempt to care for the child or obtain custody of the child within four months of the child being removed from the custody of the parents or placed in foster care, if the removal was known to the relative.

"(2) The goal of the current permanency plan formulated by the Department of Human Resources is adoption by the current foster parents."

Before the legislature's adoption of § 12-15-319(c) in 2020, this court in B.S. v. Cullman County Department of Human Resources, 865 So. 2d 1188, 1197 (Ala. Civ. App. 2003), held that the last-minute identification of a possible relative resource "was not sufficient" to establish "a truly viable alternative to the termination of the mother's parental rights." See also C.T. v. Calhoun Cnty. Dep't of Hum. Res., 8 So. 3d 984, 989 (Ala. Civ. App. 2008). Therefore, the mere existence of a potential relative placement does not necessarily preclude the juvenile court from terminating a parent's parental rights.

Although the juvenile court was not precluded from considering the relatives that moved to intervene as alternative relative placements, the record supports the juvenile court's conclusion that none of these relatives were a viable alternative to termination of the mother's

30

parental rights. As the majority recognizes, approximately two months before the final hearing, seven relatives moved to intervene. The record does not indicate that any of these individuals, who moved to intervene, had been unaware until recently that the child had been removed from P.R.'s custody and placed in foster care, that they had contacted DHR about becoming a relative placement, or that they had a relationship with the child. The child was born in 2017. At the time of the final hearing, the child had been in DHR's custody for 30 months and had resided in the foster parents' home for the past 25 months. B.M., the foster mother, testified that the child was thriving in her home and that she and her husband planned on adopting the child. The mother, on the other hand, had not visited the child in the past seven months and, at the time of the hearing, was serving a community-corrections sentence. Given that the reason for DHR's involvement with the mother was a consequence of the mother's drug use, that she was recently convicted for possession of an illegal substance, and that she exhibited other conduct indicating that reunification with the child was not a foreseeable likelihood, the juvenile court could have concluded that even if a relative placement existed, the

31

relative placement was not in the best interest of the child because the child needed permanency. Accordingly, the juvenile court could have concluded that these possible relative resources for the child did not constitute the advancement of a viable alternative to the termination of her parental rights.

Because I conclude from my review of the record that sufficient evidence was presented to support the juvenile court's decision that the child was dependent, i.e., that the statutory grounds set forth in § 12-15-319, Ala. Code 1975, were met, and that no viable alternative to termination of the mother's parental rights existed, I would affirm the juvenile court's judgment. Therefore, I respectfully dissent.