MOORE, Judge.
C.P. (“the father”) appeals from separate judgments of the Cullman Juvenile Court (“the juvenile court”) terminating his parental rights to O.P., U.P., and A.P. (“the children”). We affirm the juvenile court’s judgments.

Procedural History

On April 30, 2015, the Cullman County Department of Human Resources (“DHR”) filed separate petitions to terminate the parental rights of the father and K.P. (“the mother”) to the children. Following a final hearing on July 23, 2015," the juvenile court entered separate judgments on July 28, 2015, terminating the parental rights of the mother and the father to the children and awarding custody of the children to DHR. The father filed his notice of appeal to this court on August 6,2015.[1]

Facts

The father has an extensive history with DHR. Stephanie Lawson, a supervisor and intake worker for DHR, testified that, in October 2004, DHR had received a report that the father had taken I.S., the father’s older child from a previous relationship with T.S., and not allowed T.S. contact with I.S. for approximately nine weeks. Lawson stated that, once T.S. had regained contact with I.S. following that incident, I.S. had made statements that raised concerns that the father had exposed I.S. to drugs. According to Lawson, following that incident, the father had failed to cooperate with DHR and DHR had been unable to locate the father. Lawson testified, however, that, in 2005, DHR had received a report that I.S. had a knot on his head and that I.S. had expressed that he had received that injury from fighting with the father. Lawson stated that DHR had been unable to complete its investigation of that report because it had been unable to contact the father.
Connie Yarbrough, a service supervisor at DHR, testified that she had been supervising DHR’s investigation unit on January 26, 2010, when the unit received a report that the mother had filed a protection-from-abuse petition against the father based on his alleged commission of domestic violence. Yarbrough stated that the mother had later returned to dismiss the petition and that the person who had reported the filing of the petition to DHR had stated that the mother had indicated that she was dismissing the petition because the father had refused to return O.P., who was born March 3, 2009, to her custody unless she dismissed the petition. According to Yarbrough, the person who had made the report to DHR had also stated that the father had been very violent toward the mother and that, at one point when O.P. was two to four months old, the father had “slung” O.P. by her feet into a clothes basket. Yarbrough testified that there had initially been allegations that D.F. (“the paternal grandmother”) had provided prescription pills to the father, but the father and the paternal grandmother had denied that accusation; however, according to Yarbrough, that information had raised a concern, which had prevented the paternal grandmother from being considered as a safety-plan placement for O.P. Yarbrough stated that, when DHR began to investigate the report, it had learned that there had been five previ *1263 ous domestic-violence charges, along with additional charges, filed against the father. She stated that the father had denied any domestic violence on that most recent occasion but that O.P. had been placed into protective custody and transferred to DHR’s foster-care unit for approximately six months, after which O.P. had been returned to the parents’ custody.
Debra Coffey, who had previously worked for DHR as a social-service caseworker in the foster-care unit, testified that, while the 2010 report regarding the mother.and the father was being investigated, DHR had provided to the mother and the father individual counseling, which had included marital counseling, parenting counseling, and counseling regarding anger management and domestic violence. Coffey testified that the mother and the father had completed that counseling and that, although they had not been compliant with DHR’s directives initially, they had been compliant toward the end of the investigation and DHR’s case had been closed in December 2010. Coffey stated, however, that, in January 2011, DHR had received a report of domestic violence in the home of the mother and the father. She stated that, at that time, the mother and the' father were' separated, that the mother had gone to the father’s house to pick up O.P. for visitation, and that a “brawl” had broken out, culminating in the father’s shooting a gun into the air and his leaving with O.P. Coffey testified that, when the mother had arrived to pick up O.P. on that occasion, the paternal grandmother had become physically .aggressive toward her and the paternal grandmother and the father had not allowed the mother to take O.P. with her. According to Coffey, there had been concerns at that time regarding the father’s use of drugs, including his smoking marijuana and taking Ad-derall, a prescription medication that had not been prescribed to him. Coffey testified that O.P. was taken back into DHR’s care at that time due to the domestic violence in.the father’s home and that the mother-and the father were not cooperative with DHR. She stated that the father had claimed- that he had not shot the gun at anybody, only up in the air, and that the mother and the father had failed to acknowledge that shooting a firearm around a child was a strong reason for concern.
Amy Smith, a DHR employee, testified that, in February 2014, DHR had received a report that A.P. had been born on January 31, 2014, and that he had tested positive for opiates and amphetamines at his birth. She stated that, at that point, DHR had initiated an investigation and had performed drug screens on the mother and the father, which were negative. Smith stated that DHR had spoken with the mother’s doctor, who had indicated that the mother’s use of a prescription drug and an over-the-counter medication could have resulted in false positive results for opiates and amphetamines in A.P. Although DHR did not have an opportunity to intervene at that time based on the lack of concern by the mother’s doctors, Smith testified that that investigation was still open in April 3, 2014, when DHR received a report regarding an incident with the father.
Daniel Cummings, a deputy sheriff at the Cullman County Sheriffs Department, testified that he had responded to a call in reference to a possible intoxicated driver at a gas station on April 3, 2014, at approximately 11 p.m. and that, when he arrived, he had discovered the father attempting to “slim jim his car open” because he had locked his keys in his car. Cummings testified that he had spoken with the father, that the- father “would go ;from very calm to irate,” and that the father had been unable to -stay still. According to Cummings, he had performed a field-sobri *1264 ety test on the father and the father had performed poorly. Cummings stated that he and Sgt. Brandon Eddy, who had arrived at the scene to assist him, had discovered a small child in the father’s vehicle after it had been unlocked and that they had contacted a DHR worker to assess the situation. Jamie Knight, who was working as an adult-service worker for DHR at that time, testified that she had been the on-call worker who had responded to the call regarding the family on April 3, 2014. Cummings testified that the father had not let him know that there was an infant in the vehicle and that he had discovered the child only upon checking the father’s vehicle. According to Knight, I.S. and O.P. were also inside the vehicle on that occasion. Cummings testified that he had discovered inside the vehicle a container of what he and Eddy had believed to be heroin and that he and Eddy had also discovered in the father’s pockets a bag of Xanax pills that the father had attempted to throw on the ground beneath the vehicle. Cummings stated that the father had appeared to be under the influence of either methamphetamine or some type of prescription drug. He stated that, in that condition, it was not safe for the children that were with the father to be in the vehicle with him while he was driving. Cummings testified that the father had been arrested on that occasion for driving under the influence and drug possession.
Knight testified that A.P., who was three months old at the time, was found naked, covered in urine and feces, and in a car seat that was not properly secured in the vehicle. According to Knight, there was no food or anything in the vehicle for A.P. and A.P. had a really bad diaper rash. Knight testified that it had been obvious that the father was under the influence of some kind of drug on that occasion. Knight stated that Smith, who was her supervisor, had directed her to create a safety plan. Knight stated that, pursuant to the safety plan that had been developed and signed by the mother, the father was to have no contact with the children and the children would go with the mother to stay at the home of the father’s sister, V.P. (“the father’s sister”), until DHR could better assess the situation. Smith testified that, after DHR had assessed the situation, there had been some concern with placing the children with the father’s sister because she had an open case with DHR resulting from a drug-related issue, so DHR had put a new plan in place for the children to reside in the paternal grandmother’s home, with the father’s sister assisting and monitoring that safety plan. She stated that a part of the continuing safety plan was that the father was not to have contact with the children. According to Smith, however, DHR began receiving repeated reports that the father was being allowed into the paternal grandmother’s home; Smith stated that DHR had visited the home in response to those reports and that the father’s vehicle had been present on several occasions, but nobody would answer the door. Smith testified that DHR was not getting the level of cooperation it needed from the paternal grandmother to maintain that safety plan because DHR did not have access to the children to be able to monitor their safety and compliance with the safety plan. Smith testified that, after an unannounced visit on May 20, 2014, when the children had been found at home alone with the mother, DHR had made the' decision to remove the children from the paternal grandmother’s home and to place them into foster care because of continuing concerns regarding the paternal grandmother’s lack of compliance with DHR’s directives. Although Smith admitted that DHR had not had concrete evidence showing that the safety plan was not being *1265 complied with at the time the children were removed from the paternal grandmother’s home, she testified that, after the children were removed, the children had disclosed during an interview that the father had been in the paternal grandmother’s home, in violation of the safety plan. Smith stated that, at that time, DHR had not been provided information regarding other family members that were appropriate for placement of the children.
Smith testified that, at' some time before August 2014, the father had agreed that he would have no further contact with I.S., and DHR’s case on I.S. had been closed; however, she stated that, in August 2014, DHR had received a report indicating that the father had threatened to take I.S. from school and that DHR had intervened to ensure I.S.’s protection. According to Smith, a safety plan had been entered and DHR had maintained that safety plan until December 16, 2014, when the Cullman Circuit Court entered a judgment that stated, among other things, that the father was to have no visitation rights with I.S. Smith testified that, during DHR’s investigation of the report regarding I.S., information had been presented to DHR indicating that the father had sought treatment for an overdose of heroin in July 2014, that rehabilitation had been recommended as a result of that incident, and that the father had not followed through with complying with that recommendation. Anthony Wayne Dunn, who was employed by Turnaround Counseling in Cullman, testified that he had performed a drug evaluation on the father in July 2014 and that the father had indicated that he had “[qjuite a few issues.” Dunn testified that the father had informed him that he had overdosed on heroin a few days earlier, and, according to Dunn, the father “had a tremendous problem with marijuana” and was on “quite a number of prescription medications,” including trazodone, Valium, Lor-tab, Adderall, and Xanax. Dunn stated that the father had been very cooperative at the time of the evaluation and that he had recommended that the father enter a 14- to 21-day treatment program and then participate in an after-care program upon his release. He stated that he did not have any knowledge that the father had followed up with that treatment recommendation. Dunn testified that, if the father had entered into inpatient treatment but had not completed it, that would likely show a lack of motivation to do the things he needed to do.
Leah Ruggerio, an employee of DHR, testified that she had been the foster-care worker on the family’s case beginning in June 2014. She testified that DHR had offered the mother and the father drug screenings, substance-abuse treatment, domestic-violence services, psychological evaluations, parenting classes, individual counseling; and family support. Ruggerio testified that her concerns with regard to the family were that there had been continued drug use by the mother and the father and that there continued to be domestic-violence issues between them. According to Ruggerio, the father used numerous prescription medications and illegal drugs, there had been numerous times that he had failed to show up for drug screens, and he had statéd that he would go to only one particular place for a drug screen and that screening ■ location had changed during the pendency of the case, which made it difficult for DHR to trust what was being provided in those drug screens. Ruggerio stated that, on one occasion in July 2014, the father had arrived at a meeting knowing that he was going to be required to submit to a hair-follicle drug screen that day and that 'he had shaved all of his hair from his head and body. She stated that the testing facility had *1266 been unable to complete the drug screen on that occasion because there was no ham on the father’s body, and, she said, the father had refused a urine screen at that time. According to Ruggerio, the father had tested positive for heroin and morphine in July 2014 and he had,tested positive for oxycodone in June 2015. She testified that the father had admitted that he had overdosed on heroin and had been hospitalized; according to Smith, the father had stated that he had used heroin because I.S. had emotional issues and he and I.S.’s mother, T.S., had gotten into an argument. Ruggerio testified that that admission indicated to her that the father does not have impulse control and that he cannot maintain sobriety in. stressful situations. She stated that the father had stated that he had attended inpatient rehabilitation at Pearson Hall, but, she said, he had not completed the program and he had not spoken to her about finding another appropriate program for drug treatment, which she had offered to him routinely. According to Ruggerio, the father denied having a drug problem and the paternal :• grandmother also denied that the father had problems with drugs,
Ruggerio testified that the father had had multiple arrests since she had become the worker on the case and that that had been an ongoing problem as well. Rug-gerio testified also that there- had been several petitions for protection from abuse that had been filed against the father and that there áre other domestic-violence indicators in the legal record, which, she said, is a concern for DHR regarding the parents’ ability to safely care for the children-. She stated that the father had been arrested for theft of property in January 2015 and that there had been a number of additional theft charges and drug charges filed against the father. Ruggerio testified that she had performed a home evaluation on the paternal grandmother’s house; the report from that evaluation, which had been performed on January 9, 2015, was entered as an exhibit. According to Rugger-io, she had determined that the paternal grandmother’s house was not appropriate for the children because there was no space available for the children to sleep and because most of the house had been blocked off with a tarp because it was being remodeled or repaired and was unsafe. She stated that the porch on the house was not sturdy and that the children could fall through the floor in that area of the . house. Ruggerio testified that, in March 2015, DHR had been allowing the paternal grandmother to supervise some visits between the mother and the father and the children and that, on March 28 or 29, 2015, DHR had received a report that the mother and the father had been arrested for theft and that O.P. had been left alone. ■ :
Summer Gibson, a child-abuse/neglect investigator for DHR, testified that she had received a report on April 20, 2015, regarding the family and that, pursuant to that investigation, she had performed a home study at the paternal grandmother’s house, which, she said, had resulted in a report indicating that the house was not a suitable home for the children because .the house was in disarray and was under renovation and the grass in the yard had been waist high. Gibson stated that she had interviewed the paternal grandmother, who had said that she was “through with” the mother and the father. According to Gibson, the mother had disclosed to her in an interview that, the paternal grandmother provided medication to the father. Gibson testified that the paternal grandmother had indicated that the father had done nothing wrong and that she had been very protective of the father. According to Gibson, the paternal grandmother had indicat *1267 ed that she had provided a home for the father and the mother to live in, that she had paid their bills, and that she had employed them to help around the house. Ruggerio also testified that the paternal grandmother had paid all of the mother’s and the father’s bills and that it appeared that the paternal grandmother sought to control the mother and the father. She stated that the mother had told her that the father had often physically attacked her while the paternal grandmother watched and encouraged him, that the paternal grandmother enables the father’s heroin use, and that the paternal grandmother gives the father 30 to 60 tablets of Roxicet, a prescription pain medication, each month. Ruggerio testified that the paternal grandmother enables the father and that it would not be a good solution to have the children living in the paternal grandmother’s house with her connection to the father.
. The paternal grandmother testified that she had not violated the safety plan that DHR had outlined following the April 2014 incident at the gas station. She denied having witnessed the father attacking the mother or ever encouraging him to do so. According to the paternal grandmother, although there were major renovations going on at her house, everything is safe. The paternal grandmother testified that, at the time of the trial, she was prescribed Xanax, Pristiq, Topamax, Flexeril, oxyco-done, Adderall, metoprolol, Savella, and vitamins and supplements. She stated that she takes those medications daily and that they are for a number of conditions, including fibromyalgia, hypertrophic car-diomyopathy, chronic fatigue, chronic pain, depression, ■ ocular migraines, generalized anxiety disorder, and stress.. She stated that she had not ever provided the father with medications if he was out of some of the drugs that he had been prescribed.

Analysis

 The father first argues on appeal that the juvenile court erred in terminating his parental rights to the children because, he says, viable alternatives to termination exist. Specifically, the father asserts that awarding custody to the paternal grandmother is a viable alternative to termination.
“Although a juvenile court is required to consider alternatives to termination under Ex parte Beasley, 564 So.2d [950] at 954 [ (Ala.1990) ], the juvenile court is not required to accept any suggested alternative as ‘viable’ simply because it exists. ‘We have recently explained ... that a “fit and willing” relative is one who can care for the child’s physical, emotional, mental, and other needs during the child’s minority. J.B. v. Cleburne County Dep’t of Human Res., 991 So.2d 273, 283 (Ala.Civ.App.2008).’ B.H. v. Marion County Dep’t of Human Res., 998 So.2d 475, 481 (Ala.Civ.App.2008). The determination of whether a viable 'alternative to termination exists in a given case is a question of fact, T.V. v. B.S., 7 So.3d 346, 352 (Ala.Civ.App.1998) (citing J.B., 991 So.2d at 282). Our review of a juvenile court’s decision on the viability of a particular alternative is governed by the ore tenus rule. T.V., 7 So.3d at 353.”
J.A. v. Etowah Cty. Dep’t of Human Res., 12 So.3d 1245, 1254 (Ala.Civ.App.2009). In J.B. v. Cleburne County Department of Human Resources, 991 So.2d 273, 282 (Ala.Civ.App.2008), this court outlined the applicability of the ore tenus rule as it relates to evidence regarding viable alternatives to termination of a parent’s parental rights;
“The determination of-whether a viable alternative to termination of parental rights exists is a question of fact to be decided by the juvenile court. See Ex *1268 parte J.R., 896 So.2d 416 (Ala.2004). On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court’s factual findings regarding viable alternatives are correct. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). However, because of the serious nature of a judgment severing a familial relationship, see L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), this court conducts a ‘careful search of the record’ to determine whether such findings are supported by clear and convincing evidence. In re Moore, 470 So.2d 1269, 1270 (Ala.Civ.App.1985). See also Columbus v. State Dep’t of Human Res., 523 So.2d 419, 421 (Ala.Civ.App.1987); and Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). ‘Clear and convincing evidence’ is ‘ “[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.” ’ L.M. v. D.D.F., 840 So.2d at 179, citing in turn Ala.Code 1975, § 6-ll-20(b)(4).”
The juvenile court made the following findings of fact with regard to alternatives to termination and the paternal grandmother as a viable relative resource:
“Testimony was also given as to [DHR’s] search for appropriate relative resources. The paternal grandmother testified as to being a relative resource. However, she does not have a suitable residence for small children to live. She is in denial as to the father’s (her son’s) chronic drug problem, domestic violence and criminal issues. The evidence showed that she was an enabler of the father and his continued poor judgment.”
Based on the evidence presented at the final hearing in this matter, we conclude that the juvenile court’s findings with regard to the paternal grandmother as a relative resource are supported by clear and convincing evidence. Both Ruggerio and Gibson had performed a home evaluation on the paternal grandmother’s house, and both reported that the house was not appropriate for the children. Ruggerio testified that, after reviewing the photos from Gibson’s evaluation, which was performed approximately five months after the evaluation she had performed, there did not appear to have been any improvement with regard to the condition of the house. Thus, the juvenile court was within its discretion to determine that the paternal grandmother’s house continued to be unsuitable for the children. There was testimony from several of the DHR workers indicating that the paternal grandmother had enabled the father by providing him with drugs, encouraging him to act violently toward the mother, and paying his bills. Additionally, there was testimony presented indicating that the paternal grandmother had allowed the father contact with the children although DHR’s safety plan at the time prevented such contact. The paternal grandmother testified that she was prescribed a number of prescription medications to treat several different medical issues from which she suffers. The juvenile court could have determined from the testimony presented that the paternal grandmother was unable to care for the children’s physical, emotional, mental, and other needs. Thus, we decline to reverse the juvenile court’s judgments insofar as the juvenile court concluded that awarding custody to the paternal grandmother was not a suitable alternative to termination of the father’s parental rights.
*1269 The father also argues on appeal that DHR was obligated to investigate additional viable alternatives to termination of his parental rights and that it had failed to submit any evidence indicating an effort by DHR to locate any additional relative resources. Ruggerio testified that the mother and the father had provided her with names of potential relative resources, that she had checked out those potential resources, and that she had ruled them out as viable options. The juvenile court heard evidence regarding those relatives and the reasons that they had been ruled out as resources, which included histories with DHR, disinterest, drug abuse, and the status of one relative as a sex offender. The father has failed to present evidence indicating that DHR failed to consider any viable alternatives to termination of his parental rights that had been presented and has failed to present on appeal any argument regarding a potential viable alternative other than his argument regarding awarding custody to the paternal grandmother. Because the juvenile court’s determination that DHR had explored potential relative resources and had determined that none of those potential resources was appropriate for the children’s placement is supported by the evidence presented in the record, we decline to reverse the juvenile court’s judgments based on this argument.
The father next argues on appeal that the juvenile court erred in terminating his parental rights rather than maintaining the status quo. The father cites L.M.W. v. D.J., 116 So.3d 220 (Ala.Civ.App.2012), and M.G. v. Etowah County Department of Human Resources, 26 So.3d 436 (Ala.Civ.App.2009), in support of that argument. In L.M.W,, this court reversed the termination-of-parental-rights judgment at issue in that ease because, we determined, maintaining the status quo was a viable alternative to termination. 116 So.3d at 226. In that case, the child at issue had been placed with relatives, the mother had maintained both a residence and employment for over two years at the time of the trial, and there was testimony indicating that the child had requested visitation with the mother, .and that there was strong bond between the mother and the child. Id. at 224-25. In M.G., this court determined that the current conditions of the mother in that case did not merit termination of her parental rights because, in the months preceding the termination-of-her-parental-rights hearing, she had moved into her own home, had maintained employment, and had • parented another child without incident. 26 So.3d at 439-44.
“This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care'for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.” D.O. v. Calhoun Cty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003). However, “ ‘[i]n deciding to terminate parental rights, a trial court may consider the past history of the family as well as the evidence pertaining to current conditions.’ ” A.R. v. State Dep’t of Human Res., 992 So.2d 748, 760 (Ala.Civ.App.2008) (quoting T.B. v. Lauderdale Cty. Dep’t of Human Res., 920 So.2d 565, 570 (Ala.Civ.App.2005)). In the present case, the father’s history with DHR is extensive. The testimony revealed a history of drug abuse, domestic violence, and arrests. With regard to the father’s current conditions at the time of the final hearing, the testimony revealed that the father had contacted Ruggerio on June 10, 2015, after he had been released from jail, and had asked what he needed to do to get the children back. Ruggerio testified that the father’s most recent drug screen, conduct *1270 ed only one month ■ before the trial, had been positive for oxycodone, a prescription medication, and there was no evidence presented indicating that the father had a prescription for that medication. Rugger-io also testified that, to her knowledge, at the time of the final hearing, the father was awaiting a revocation hearing concerning some criminal charges, which, she said, could result in him spending some time in prison: The evidence revealed that the father had not completed domestic-violence classes or inpatient drug treatment, as recommended, at the time of the final hearing. Additionally, the juvenile court could have considered the father’s history with DHR, including his domestic-violence issues, his drug issues, his multiple arrests during the pendency of the most recent DHR case involving the family, and his financial dependency on the paternal grandmother.
The father argues that the evidence revealed that a strong bond exists between him and the children. Although evidence was presented indicating that the mother and the father had brought food or gifts to their visits with the children and that the children were always glad to see them, there was also evidence presented indicating that the mother and the father were not attentive to the children during the visits and that their parenting abilities had declined over the course of those visits. Unlike in L.M.W., the children in the present cases are not residing with a relative; rather, they have been in foster care since May 20, 2014. “This court has held that maintaining a child in foster care indefinitely while a parent attempts to rehabilitate himself or herself is not a viable alternative to the termination of parental rights.” A.H. v. Houston Cty. Dep’t of Human Res., 122 So.3d 846, 851 (Ala.Civ.App.2013). Because the juvenile court could have determined that both the father’s history with DHR and his current conditions indicated that the father was unwilling to care for the children and that that was unlikely to change in the foreseeable future, we decline to reverse its judgments terminating the parental rights of the father to the children to allow the father additional time to rehabilitate himself while the children remain in foster care.
The father last argues on appeal that the juvenile court’s failure to provide him with effective assistance of counsel warrants reversal. The father cites a number of cases indicating that a parent has a right to appointed counsel in a termination-of-parental-rights case; we note, however, that the juvenile court appointed an attorney to represent the father on July 6, 2015. Citing A.S.H. v. State Department of Human Resources, 991 So.2d 755 (Ala.Civ.App.2008), the father argues that, because his counsel was appointed on July 6, 2015, and the final hearing was held on July 23, 2015, his appointed attorney had insufficient time to prepare for the hearing. We note first that, in A.S.H., the parents had separated before the termination-of-parental-rights hearing, had fired their appointed attorney, and had requested a continuance, which the trial court had denied, resulting in the parents’ being forced to proceed without an attorney at the final hearing. 991 So.2d at 755. This court determined that the trial court had erred based on the parents’ rights to appointed counsel in a termination-of-parental-rights case. Id. at 757. In the present cases, counsel for the mother and the father filed a motion to withdraw on June 3, 2015; that motion was granted. The juvenile court appointed an attorney to represent the father on July 6, 2015. Thus, in the present cases, unlike in A.S.H., the father had been appointed counsel following his separation from the mother and the withdrawal of them joint attorney. More *1271 over, unlike in A.S.H., the father failed to raise an ineffective-assistanee-of-counsel claim to the juvenile court at any time;[2] thus, this court cannot consider that argument because it has been raised for the first time on appeal. S.E. v. J.D.G., 869 So.2d 1177, 1178-79 (Ala.Civ.App.2003).
Based on the above-stated reasoning, we affirm the juvenile court’s judgments terminating the father’s parental rights to the children.
2140933 — AFFIRMED.
2140934 — AFFIRMED.
2140935 — AFFIRMED.
THOMPSON, P.J., and PITTMAN, THOMAS, and DONALDSON, JJ., concur.

, Because the mother has not appealed the termination of her parental rights to the children, we address die facts and proceedings with regard to the mother only insofar as they pertain to the father’s appeal.

. The father asserts on appeal that, had the juvenile court granted his request for a continuation in these cases, DHR would not have been prejudiced, but that the denial of the motion to continue had extremely prejudiced the father. To the extent that that assertion implies that the father’s appointed counsel had sought a continuation to better prepare for the hearing, we note that, at the outset of the final hearing, the father’s appointed attorney requested a continuance until such time as a petition that had been filed by the paternal grandmother could be heard. At no time did the father’s appointed counsel argue before the juvenile court that she had inadequate time to prepare for the hearing.