Rel:  December 19, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

————————————————

### CL-2025-0273

————————————————

## F.D.

## v.

## Calhoun County Department of Human Resources

————————————————

### CL-2025-0276

————————————————

## T.M.

## v.

## Calhoun County Department of Human Resources

## Appeals from Calhoun Juvenile Court
## (JU-23-737.02)

FRIDY, Judge.

F.D. ("the father") and T.M. ("the mother") appeal from a judgment of the Calhoun Juvenile Court ("the juvenile court") terminating their parental rights to their child, T.D. ("the child"). For the reasons set forth herein, we affirm the judgment.

<u>Background</u>

On January 23, 2025, the Calhoun County Department of Human Resources ("DHR") filed in the juvenile court a petition seeking to terminate the parental rights of the mother and the father on the grounds that, among other things, they each had a history of excessive use of alcohol or controlled substances of a duration or nature that rendered them unable to care for the child, they had failed to provide for the material needs of the child, they had failed to maintain regular visitation with the child, they were unable or unwilling to discharge their responsibilities to and for the child or their conduct rendered them unable to properly care for the child and that conduct was unlikely to change in the foreseeable future, and they had failed to put forth effort to adjust their circumstances to meet the needs of the child. In the petition, DHR noted that the juvenile court had previously found the

child dependent. The juvenile court held a trial on the petition on April 3, 2025.

At the trial, Courtney Surrett, a caseworker with DHR, testified that DHR became involved with the child in May 2023, after receiving a report that the father was hiding from law-enforcement officials behind a shed with the child, who was then two years old. When the father was arrested, law-enforcement officials found that he had a syringe with him. The father was arrested for having the syringe and for having outstanding warrants, Surrett said. Because the mother was in a rehabilitation facility, and had been for about four months, when the father was arrested, the child was placed in foster care about five days after DHR became involved. Surrett said that the child remained in the same foster home at the time of the trial.

Surrett said that DHR provided the mother with parenting classes and that the mother completed a psychiatric evaluation that DHR had requested. DHR also directed the mother to complete the rehabilitation program she was in when the child entered foster care, but she did not do so, Surrett said. The mother relapsed within months of failing to complete the rehabilitation program, and, later in 2023, she returned to

the same rehabilitation facility. On that occasion, Surrett said, the mother completed the program in November 2024. However, a drug screen to which the mother submitted just a few months later indicated that she had relapsed again.

Alexis Movitz, the coordinator of the Calhoun County family drug court, testified that the mother, who was in the color-code drug-testing program, participated in most of the drug screens she was asked to take. Edward Akers, the director of the Calhoun County Drug Testing Laboratory, testified that the results of the mother's drug screen to which the mother submitted on January 2, 2025, indicated that she was positive for benzodiazepine and opiates. The drug-testing laboratory's donor-test-details log, a copy of which was submitted into evidence, indicated that the results of the drug screen conducted on the mother the next day were negative, as were the three other screens to which she submitted between January 3 and January 15, 2025. Movitz testified that, after January 16, 2025, the mother had submitted to only one drug screen on February 12, 2025, the results of which were negative, and had missed twenty tests.

Surrett said that the father was incarcerated off and on throughout the entire case and that DHR was unable to offer him any services while

4

he was in jail. She said that, when he was released "later in the case," he entered rehabilitation. Surrett said that DHR was eventually able to hold an individualized-service-plan ("ISP") meeting for the father and that he was directed to complete rehabilitation, participate in the color-code drug-testing program, and complete a psychiatric evaluation. She testified that the father did not complete the rehabilitation program.

Regarding the father's participation in the drug-testing program, Movitz testified that, between September 2024 and trial, which was held on April 3, 2025, the father did not submit to forty of the drug screens he was supposed to take under the program. The drug-testing laboratory's log pertaining to the father indicates that, from September 19 to October 28, 2024, the father had twelve drug screens, all of which were negative; however, from October 31, 2024, through March 28, 2025, the father submitted to only one drug screen. Akers testified that the results of that screen, to which the father submitted on February 12, 2025, indicated that he was positive for alcohol, amphetamines, methamphetamine, Fentanyl, and marijuana.

Surrett said that, "a couple of weeks" before the trial on DHR's termination petition, she learned that the mother and the father were

found passed out in a pickup truck where drugs were found. The mother was arrested for public intoxication, and the father was arrested for possession of a controlled substance. Surrett said that she had heard that the charges against the mother had been dismissed.

Surrett testified that she last communicated with the mother and the father in January 2025. January 2025 was also the last time the mother visited the child, Surrett said, and, after that visit, the mother did not contact DHR to check on the child. She added that, at the time of the trial, she did not know where the mother and the father were or if they even had a house.

Surrett testified that neither the mother nor the father had provided any material support like food or clothing for the child. Leon Ziglar, the DHR child-support supervisor, testified that, during the pendency of the child's case, the mother made one court-ordered child-support payment and that she was $4,538 in arrears at the time of the trial.

The father had not visited the child since October 2024, Surrett said, and he had not contacted DHR to check on the child since January 2025. She said that the father had not given the child a Christmas

present in 2024, and she did not believe that he had ever provided material support such as clothing or food for the child. Ziglar testified that the father's monthly child-support obligation was higher than the mother's but that he had never made a payment and owed $10,765 in child support.

Surrett said that, during the time she worked with the family, the parents' employment had always been through their respective rehabilitation programs. When the parents were not in rehabilitation, Surrett said, she had not been notified that either was employed.

B.Y., the child's foster father ("the foster father"), testified that the child had lived with his wife and him since May 2023, when the child was almost three years old. At that time, the foster father said, the child was "very much mentally and physically delayed." Since living with the foster parents, who took the child to a number of specialists for treatment, the foster father said, the child had "grown tremendously." The child would also have what the foster father called night terrors two or three nights a week when visitation was permitted. Once those visitations were suspended, the foster father said, the night terrors improved.

The foster father testified that he and his wife would like to adopt the child if the parental rights of the mother and the father were terminated. He added that their bond with the child was as strong as their bond with their biological child. If the child were to be removed from their home, the foster father said, he believed that it would "severely set [the child] back and delay him."

Surrett testified that she had seen the child at the foster parents' house, where he had lived for nearly two years at the time of the trial. She said that the child and his foster family had a bond and that she believed that removing the child from the foster home would be detrimental to him.

Regarding relative resources, Surrett testified that the mother provided her with the names of her brother and her sister as possible placements for the child. Surrett said that DHR ruled out the sister as a relative resource because, she said, the sister lived with the child's maternal grandmother, who had an "extensive drug history and criminal charges." DHR ruled out the brother, Surrett said, because he did not have enough space for the child and said that he was unable to take in the child. DHR ran an Accurint search for other family members of the

mother and sent letters to those people, but, Surrett said, none of them responded. Additionally, she said, no one contacted DHR about being a relative resource for the child. Surrett testified that DHR assessed the father's brother as a possible resource but that he was ruled out because he had a history with DHR and "some criminal history."

The mother and the father did not attend the trial.

On April 7, 2025, using a preprinted form, the juvenile court entered a judgment finding that the mother and the father were unable or unwilling to discharge their parental responsibilities to and for the child. It also found that they were in such a condition or course of conduct as to be unable to properly care for the child and that that condition or course of conduct was unlikely to change in the foreseeable future. The juvenile court further found that DHR had made reasonable efforts to reunite the mother and the father with the child but that those efforts had failed. Finding no viable alternative, the juvenile court terminated the parental rights of the mother and the father and placed legal custody of the child with DHR to facilitate adoption.

The father filed a motion to alter, amend, or vacate the judgment, which the juvenile court denied. The mother and the father filed notices of appeal.

Standard of Review

A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792, 795 (Ala. Civ. App. 2013). "'Clear and convincing evidence' is '[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). When ore tenus evidence is presented to a juvenile court, its factual findings in a judgment terminating parental rights are presumed to be correct. K.P. v. Etowah Cnty. Dep't of Hum. Res., 43 So. 3d 602, 605 (Ala. Civ. App. 2010). "The ore tenus rule is based, in part, on the unique position of the trial court to personally observe the parties and witnesses and to assess their demeanor and credibility." Lowery v. Lowery, 72 So. 3d 701, 705 (Ala. Civ. App. 2011). Furthermore, "[t]his court does not reweigh the

evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing." K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016).

Analysis

In separate briefs, the mother and the father contend that clear and convincing evidence did not support the juvenile court's judgment. When nonparents have brought an action to terminate a parent's parental rights, a juvenile court may terminate a parent's parental rights if the party seeking the termination proves that one of the grounds for termination specified in § 12-15-319(a), Ala. Code 1975, exists and that no viable alternative to terminating the parent's parental rights exists. See R.H. v. Madison Cnty. Dep't of Hum. Res., 383 So. 3d 667, 672 (Ala. Civ. App. 2023). "[P]arental rights may not be terminated, even if sufficient statutory grounds exist, when some less drastic measure might be employed to preserve the parental relationship without harming the interests of the child." B.A.M. v. Cullman Cnty. Dep't of Hum. Res., 150 So. 3d 782, 785 (Ala. Civ. App. 2014).

11

The mother argues that DHR provided insufficient evidence to terminate her parental rights. Specifically, she argues that she has "shown herself to care for [the child] and has changed her circumstances." In support of her position, the mother says that she had successfully completed her drug-rehabilitation program, was participating in visits, and had gainful employment and her own residence. Her assertion, however, ignores much of the evidence presented.

The record indicates that DHR recognized that substance abuse was a barrier to the mother's reunification with the child and directed the mother to continue the rehabilitation program in which she was enrolled when the child was taken into DHR's custody. The mother dropped out of that program and relapsed. She enrolled in the same substance-abuse rehabilitation program and completed it in November 2024. Within two months, however, the mother had relapsed again. In short, the undisputed evidence indicates that, despite obtaining treatment for substance abuse twice within eighteen months, the mother relapsed twice and was found passed out with the father in a vehicle with drugs in what appears to be a matter of weeks before the trial to terminate her parental rights.

Furthermore, despite the mother's contention that she was gainfully employed and had her own residence, Surrett said, the mother did not remain in contact with DHR, and Surrett did not know where the parents were at the time of the trial. Surrett also said that the mother had been employed through her rehabilitation programs but that she had never been notified that the mother had held a job outside of her rehabilitation programs and she did not know whether the mother was employed at the time of the trial. The mother had made only one child-support payment during the litigation of this matter, and she was $4,538 in arrears when the trial was held, indicating that she did not have the ability or the willingness to support herself and the child.

Based on the evidence, as well as the mother's failure to attend the trial on the termination of her parental rights, the juvenile court could have been clearly convinced that, despite efforts to rehabilitate herself, the mother was unable or unwilling to adjust her circumstances or change her conduct sufficiently to enable her to carry out her responsibilities for the child or to demonstrate that she was able to properly care for the child.

13

The mother also contends that DHR had failed in its duty to make reasonable efforts to promote reunification between the child and her. "Although DHR must make reasonable efforts to reunite a parent and child, the parent must make himself or herself available to DHR and must make an effort to address his or her issues and improve his or her circumstances." A.M.F. v. Tuscaloosa Cnty. Dep't of Hum. Res., 75 So. 3d 1206, 1212 (Ala. Civ. App. 2011). Additionally, DHR is not required to duplicate services if those services have been unsuccessful. See K.W. v. Lee Cnty. Dep't of Hum. Res., 390 So. 3d 1080, 1092-93 (Ala. Civ. App. 2023); J.C. v. Cullman Cnty. Dep't of Hum. Res., [Ms. CL-2024-0763, Mar. 21, 2025] ___ So. 3d ___ (Ala. Civ. App. 2025).

Based on the evidence, the juvenile court could have been clearly convinced that continued efforts to treat the mother would not render her able or willing to care for the child and that two relapses within eighteen months, the latter relapse coming only two months after the mother completed a treatment program, indicated that the mother's conduct or condition was unlikely to change in the foreseeable future. It also could have been clearly convinced that the child's need for permanency and stability outweighed giving the mother an additional opportunity to

14

improve her circumstances. The child had lived with the foster family for nearly two years at the time of the trial and had formed a bond with the family. The mother has failed to demonstrate that clear and convincing evidence did not support the juvenile court's judgment terminating her parental rights.

The father contends that DHR failed to offer him sufficient services or make reasonable efforts to help him toward reunification. He argues that, despite knowing that he had left the rehabilitation facility where he had been receiving treatment, DHR did nothing to assist him with the services that had been recommended for him in his ISP. The father also says that, although he underwent a psychological assessment, DHR did not discuss with him other services that he could work with to regain custody of the child, which, he says, he was willing to do.

Like the mother, the father had a duty to avail himself of the services that DHR offered to him and to put forth an effort to work toward reunification. A.M.F., 75 So. 3d at 1212. However, the evidence indicates that the father was incarcerated "off and on" throughout the litigation, and DHR was unable to offer him services during his periods of incarceration. The father had been arrested for possession of a controlled

substance just weeks before the trial of this matter, and the juvenile court could have believed that, because of his history, the father was likely to be incarcerated again. Evidence also showed that, when the father had the opportunity to work toward reunification by completing his rehabilitation program, he left the program early. Contrary to his assertion that he maintained visitation with the child, the undisputed evidence indicated that, from October 2024 until the time of the trial in April 2025, the father had not visited the child. He also failed to maintain contact with DHR, which did not know how to locate him when the trial was held. It is also undisputed that the father had not paid any child support despite a court order that he do so, and his child-support obligation was in arrears more than $10,000. Finally, like the mother, the father also failed to attend the trial in which his parental rights were at issue.

Based on the evidence, the juvenile court could have been clearly convinced that the chances of rehabilitation of the father were remote and that offering him any further services would be futile. And again, the juvenile court reasonably could have concluded that the child's need for permanency and stability with the foster family outweighed providing

16

the father with further opportunities to work toward reunification. Therefore, we cannot conclude that the juvenile court erred in determining that DHR had made reasonable efforts to reunite the father and the child and that those efforts had failed.

The father also contends that maintaining the status quo was a viable alternative to the termination of his parental rights. The general rule is that maintaining children in foster care indefinitely is not a viable alternative to terminating a parent's parental rights, see, e.g., C.P. v. Cullman Cnty. Dep't of Hum. Res., 203 So. 3d 1261, 1270 (Ala. Civ. App. 2016). However, a juvenile court should maintain foster care without terminating parental rights "when a child shares a beneficial emotional bond with a parent and the custodial arrangement ameliorates any threat of harm presented by the parent." B.A.M., 150 So. 3d at 786. Here, there is no evidence of an emotional bond between the father and the child.

To the extent that the father contends that the child could have been placed with a relative, the evidence indicates that DHR rejected the relatives that he and the mother named as possible resources for the child. He does not make any argument that DHR's rejection of those

relatives was improper, and he does not contend that there were any other relative resources. Based on the argument presented, the juvenile court did not err in determining that no viable alternatives to terminating the father's parental rights existed.

## Conclusion

The record demonstrates that clear and convincing evidence supports the juvenile court's judgment terminating the parental rights of the mother and the father; therefore, we affirm the juvenile court's judgment.

CL-2025-0273 -- AFFIRMED.

CL-2025-0276 -- AFFIRMED.

Moore, P.J., and Edwards and Hanson, JJ., concur.

Bowden, J., dissents, with opinion.

BOWDEN, Judge, dissenting.

The Calhoun Juvenile Court ("the juvenile court") found that the Calhoun County Department of Human Resources ("the Calhoun DHR") had made reasonable efforts to reunite T.M. ("the mother") with T.D. ("the child"). Based on my review of the record, however, there is no evidence that the Calhoun DHR made any effort to rehabilitate the mother until it offered to provide the mother with color-code drug-testing services in September 2024 -- more than 19 months after it took custody of the child in May 2023. Although we have not yet defined how "immediate" the state's "immediate duty" to attempt reunification is, "immediate" cannot mean more than 19 months after the child enters state custody. Accordingly, I respectfully dissent.[1]

---

[1]I do not address the merits of the appeal of F.D. ("the father") because reversing the judgment terminating the mother's parental rights may render the termination of the father's parental rights unwarranted. See W.A. v. Calhoun Cnty. Dep't of Hum. Res., 211 So. 3d 849, 853 (Ala. Civ. App. 2016) ("[B]ecause we are reversing the judgment insofar as it terminated the father's parental rights and, therefore, the father may prove to be a suitable custodian who could supervise visitation of the mother and the child, which would be a viable alternative to terminating the mother's parental rights, we also reverse the judgment insofar as it terminated the mother's parental rights ….").

I. <u>The significance of parental rights</u>

Parental rights are God-given rights. <u>Ex parte G.C.</u>, 924 So. 2d 651, 661 (Ala. 2005)(Stuart, J., concurring specially). They are also fundamental constitutional rights. See § 26-1-6, Ala. Code 1975; <u>E.P. v. Etowah Cnty. Dep't of Hum. Res</u>, 42 So. 3d 1250, 1255 (Ala. Civ. App. 2010); <u>Herring v. State</u>, 100 So. 3d 616, 623–24 (Ala. Crim. App. 2011). I highlight the God-given, fundamental nature of parental rights to underscore how important it is for the state to provide evidence that it satisfied every element to terminate parental rights, in every termination-of-parental-rights action that it brings. The state's evidentiary burden is "high" and "'given the constitutional rights of the parents involved in [a termination-of-parental-rights] proceeding … <u>it is imperative that the parties completely develop the evidence at trial</u>.'" <u>M.W. v. Marshall Cnty. Dep't of Hum. Res.</u>, 399 So. 3d 287, 294 (Ala. Civ. App. 2024)(quoting <u>In re D.L.W.W.</u>, 617 S.W.3d 64, 92 (Tex. App. 2020)). "We should not lose sight of the fact that the termination of parental rights is the most Draconian of measures taken by the civil law, resulting in a complete and permanent severance of the most precious of all human

relationships." Ex parte M.D.C., 39 So. 3d 1117, 1143 n.14 (Ala. 2009) (Murdock, J., dissenting).

II.     The state's immediate duty to attempt reunification

When the state brings a termination-of-parental-rights action, it must prove that it made "'"a fair and serious attempt to reunify a parent with [his or her] child."'" P.R.P. v. Marshall Cnty. Dep't of Hum. Res., 419 So. 3d 1018, 1029 (Ala. Civ. App. 2024)(quoting H.H. v. Baldwin Cnty. Dep't of Hum. Res., 989 So. 2d 1094, 1104 (Ala. Civ. App. 2007)(plurality opinion), quoting in turn State ex rel. A.C., 97 P.3d 706, 712 (Utah Ct. App. 2006)). We have described the state's duty to attempt reunification as an "immediate duty" that arises as soon as the state places the child in foster care. H.B. v. Mobile Cnty. Dep't of Hum. Res., 236 So. 3d 875, 882 (Ala. Civ. App. 2017). And we have articulated the following summary to "clearly and concisely apprise[] [the state] of the nature of its duties to act promptly and reasonably to reunite families":

> "'The natural starting point in any fair and serious attempt to rehabilitate the parent and to reunite the parent with the child is identification of that characteristic, conduct, or circumstance that renders the parent unfit or unable to discharge his or her parental responsibilities to the child. Once [the state] identifies the source of parental unfitness, the overarching goal of family reunification requires [the state] to communicate its concerns to the parent and to

21

develop a reasonable plan with the parent that is tailored toward the particular problem(s) preventing the parent from assuming a proper parental role. [The state] should use reasonable methods to achieve its plan of removing or reducing the identified obstacle(s) to family reunification "as quickly and as safely as possible." Ala. Code 1975, § 12-15-[312(b)]. Finally, at the termination of any rehabilitation process, DHR should determine the success of its efforts, using reasonable evaluation tools.'"

P.R.P. v. Marshall Cnty. Dep't of Hum. Res., 419 So. 3d 1018, 1029 (Ala. Civ. App. 2024)(citation omitted). Put even more simply, the state's immediate duty to attempt reunification requires the state to (1) identify the conditions rendering the parent unfit; (2) "develop a reasonable plan with the parent that is tailored toward the particular problem(s)" preventing reunification; and (3) use reasonable methods to achieve the plan as "'"quickly and safely as possible"'" while evaluating the success of those methods. Id. If the state fails to meet its immediate duty to attempt reunification, it has failed to make reasonable efforts to reunite a parent with his or her child, and the judgment terminating parental rights must be reversed. Id. at 1030.

How can the state prove that it met its immediate duty to attempt reunification? The best practice would be for the state to admit or elicit testimony about the parent's individualized service plan ("ISP"), which

22

the Department of Human Resources ("DHR") -- the entity that brings a termination-of-parental-rights action on behalf of the state -- must develop for every family involved with child-welfare services. An ISP covers all the above-listed requirements of the state's immediate duty to attempt reunification; the ISP (1) identifies the "family's strengths and needs";[2] (2) articulates the "goals the child(ren) and family work toward to reach the desired case outcome"; and (3) sets out the "steps to be taken by individual child and family planning team members to authorize and deliver services, and to measure progress toward goals." Ala. Admin. Code (DHR), r. 660-5-47-.02(16).

DHR regulations about the creation of the ISP also ensure that the state identifies and communicates barriers to reunification to a parent in a timely manner. The initial ISP must be created within 30 days, and a meeting with the child's parent about the initial ISP must be completed 30 days after that. Thereafter, an ISP review hearing must occur at least every 180 days but can occur more often because an ISP team, which monitors and evaluates the ISP, "reconvene[s] as frequently as is

_____

[2]"Needs" are "[p]hysical or psychological conditions that will be addressed to reduce or eliminate risks to ensure a child's protection, sense of permanence, and sense of well-being." Ala. Admin. Code (DHR), r. 660-5-47.02(18).

23

necessary to revise and develop a new plan should it be found that steps and services are not being implemented or are not effectively meeting needs." Ala. Admin. Code (DHR), r. 660-5-47-.06(01).

DHR completes the ISP on a specific form, created by DHR, that contains a wealth of information about what a parent must achieve to be reunified with his or her child and how he or she should achieve it. The ISP form captures "information about the ISP meeting," as well as "demographics and for information on the family members." Ala Admin. Code (DHR), r. 660-5-47.07(01). Most significantly, the ISP form records the planned "services to meet identified needs and achieve desired permanency goals." Id. A written copy of the ISP must be provided to a parent "at the conclusion of the ISP meeting, and if this is not feasible, the plan shall be distributed to the team within ten (10) working days of the date the meeting was held." Ala. Admin. Code (DHR), r. 660-5-47-.04(8). DHR's regulations also anticipate that the ISP form may be presented to a juvenile court at every judicial review. Ala. Admin. Code (DHR), r. 660-5-47-.04(9).

Considering the comprehensive nature of the ISP and DHR's own regulations requiring the creation of ISPs, the state should introduce

evidence concerning the development, implementation, and review of a parent's ISP at every termination-of-parental-rights trial; such evidence is the strongest evidence to demonstrate that the state has met its immediate duty to attempt reunification. Conversely, if the state does not offer evidence about the development, implementation, and review of a parent's ISP -- information that the same state entity that brings a termination-of-parental-rights action has obligated itself to create and maintain -- the trial court should presume that the state has not met its immediate duty to attempt reunification.

III. <u>The state did not provide evidence that it satisfied its immediate duty to attempt to rehabilitate the mother</u>

Where does all this leave the mother in this case?

Consider the timeline established by the evidence. When the Calhoun DHR picked up the child because of the actions of the child's father in 2023, the mother had been a participant in a residential drug-rehabilitation program for four months. The mother, who had voluntarily entered the program, then left the program because the child had been placed in foster care. Months passed, but the Calhoun DHR did not return the child to her custody. There is no evidence indicating that,

25

during that period, Calhoun DHR held an ISP meeting with the mother or provided her with any services, and there is no ISP form in the record. After voluntarily leaving the drug-rehabilitation program but still not regaining custody of her child, the mother returned to drug use.

When the Calhoun DHR took the child into custody in 2023, the only evidence that the state offered about the barriers to the mother's taking custody of the child was testimony about the mother's participation in the residential drug-rehabilitation program. The state did not present evidence indicating that the mother had tested positive for drug use when it took custody of the child. Nor did it present evidence indicating that the mother's drug use had rendered her incapable of exercising her parental duties. Furthermore, even if the Calhoun DHR had identified the risk of the mother's drug use as a barrier to reunification at the time it took custody of the child, the state did not present evidence indicating that it had informed the mother of that fact or that it had developed a plan to remove that barrier "as quickly and safely as possible" after taking the child into its custody.

Sometime between June 14, 2023, and December 31, 2023, the mother reenrolled in the same residential drug-rehabilitation program.

26

If the mother had completed the drug-rehabilitation program as directed, would that be enough to regain custody? Presumably yes, based on the evidence that the state provided about the barriers to the mother's reobtaining custody.

Was it enough? Apparently not.

The mother completed the drug-rehabilitation program in November 2024. Before and after achieving that goal, the mother tested negative for drug use in 26 drug screenings. Nonetheless, after the mother completed the drug-rehabilitation program, the Calhoun DHR conducted an ISP meeting -- the first evidence of an ISP meeting in the record -- and, during that meeting, the Calhoun DHR informed the mother that it was unwilling to try to return the child to her custody. In January 2025, the mother tested positive for drug use.

I recognize that the juvenile court could have reasonably found that the mother's drug use, in the months leading up to the termination-of-parental-rights trial, rendered her unable or unwilling to parent the child. But there is not sufficient evidence indicating that the Calhoun DHR met its immediate duty to attempt reunification when it took custody of the child in May 2023. There are no ISP forms in the record

that may have informed the juvenile court about the Calhoun DHR's immediate actions to ameliorate the mother's drug problem, about any steps that the mother had taken or failed to take to rehabilitate herself, about a summary of the progress or lack of progress that the mother had made toward reunification, or about the Calhoun DHR's assessment over time about the necessity for and appropriateness of the child's placement in foster care. Instead, the evidence indicates that the Calhoun DHR's first attempt to provide services to rehabilitate the mother was in September 2024, more than 19 months after it took custody of the child. The state may have communicated its expectations to the mother and may have attempted to provide services tailored to the mother's drug use before that date, but if it did, it did not provide evidence of those efforts at the trial on its termination-of-parental-rights petition.

"'[I]t is imperative that the parties completely develop the evidence at trial.'" M.W., 399 So. 3d at 294.

Accordingly, I respectfully dissent.